ROSEMARY LEDET, Judge.
hln this criminal appeal, Jeffrey Washington and Myron Jackson appeal their convictions for second degree murder and attempted second degree murder. For the reasons that follow, we affirm.[1]

STATEMENT OF THE CASE

On January 17, 2013, Mr. Washington and Mr. Jackson were jointly charged by a grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1, and attempted second degree murder, a violation of La. R.S. 14:27,14:30.1. On January 24, 2013, Mr. Washington and Mr. Jackson were arraigned and both pleaded not guilty.
In January 2015, a five-day jury trial was held in this matter. The jury found Mr. Washington and Mr. Jackson guilty as charged.
On February 27, 2015, the district court denied Mr. Washington’s motion for new trial. The district court sentenced him on the second degree murder count to life imprisonment without benefit of parole, probation, or suspension of sentence; |2and on the attempted second degree murder count to fifty years without benefit of parole, probation, or suspension of sentence. On March 13, 2015, the district court imposed on Mr. Jackson the same sentences it imposed on Mr. Washington.

STATEMENT OF FACTS

For ease of discussion, we divide our analysis of the facts into the following two sections: the investigation and the witnesses.

The investigation

On October 1, 2012, Sergeant Karla Baker of the New Orleans Police Department (“NOPD”) was one of the first officers to arrive at the scene of the shootings at 7730 Branch Drive in the Little Woods area in New Orleans East. She noticed that a front window of the residence had been shot out. Sergeant Baker testified *429 that she found a female victim, later identified as Marguerite Washington, unresponsive on the bed in one of the bedrooms. After following the trail of blood down the hallway, she found a male victim, Justin Alexander, in his mother’s bedroom. .At trial, Sergeant Baker testified that although Mr. Alexander was- panicked, he was speaking very clearly and told his mother, Yolanda Muse, he was going to die. Sergeant Baker testified that she asked Mr. Alexander who shot him and he responded “Jeffery Washington shot me.” Sergeant Baker later relayed the victim’s identification of the shooter to Detective Gregory Hamilton, the lead investigator, and Sergeant Galvin Brazley.
Detective Hamilton, the lead investigator, testified that when’ he was notified of the shooting, he relocated to the hospital to speak with thé surviving victim, Mr. | a Alexander. After learning that Mr. Alexander was in critical condition and unable to speak, Detective Hamilton relocated to the crime scene where he met with Detective Elizabeth Garcia and Sergeant Brazely. Detective Hamilton learned that Mr. Alexander identified “Jeff’ as the shooter.' Thereafter, Detective Hamilton transports ed Ms. Muse to the homicide office to record her statement. Ms. Muse identified Mr. Washington as “Jeff’ from a photo lineup and confirmed that he was a friend of Mr. Alexander. On the day after the shooting, Mr. Washington was arrested pursuant to an arrest warrant.
On November 20, 2012, Detective Hamilton met with Mr. Alexander, who "then had been released from the hospital,' regarding the shooting. During the interview, Mr. Alexander identified Mr. Jackson as a second shooter. Mr. Alexander drew a sketch of Mr. Jackson, depicting several of his facial tattoos; and he identified Mr. Jackson from a photo lineup. Detective Hamilton obtained search warrants for Mr. Washington and Mr. Jackson’s cell phone records; and he discovered that they were both in Little Woods area at the time the shooting occurred. Detective Hamilton obtained an arrest warrant for Mr. Jackson. After videotaping Mr. Jackson’s statement, Detective Hamilton arrested ■him.
Detective Garcia testified that after she arrived at the Branch Drive residence, she contained the crime scene; contacted the crime lab; and documented evidence. Detective Garcia testified that Ms. Washington’s body was laying on the |4bed in the room with the broken window.[2] She also testified that a Bryco .9-millimeter handgun was retrieved from Ms. Muse’s bedroom. At the direction of Detective Hamilton, Detective ' Garcia presented Ms. Muse a photo lineup in a double blind procedure at headquarters. Ms. Muse chose the picture of Mr. Washington from the photo lineup.
Homicide Detective Andrew Waldron testified that he assisted Detective Hamilton in the investigation of this case. He conducted a, blind lineup process with Mr. Alexander, who identified Mr. Jackson as one of the two men who shot him and Ms. Washington.
NOPD crime scene technicians, Veronica Manuel and Erin Cunningham,- collected evidence, photographed the crime scene, and drafted' reports regarding their findings. At trial, Ms. Manuel identified the seven spent casings — three CCI .45 millimeter auto casings, four Win .9 millimeter Logan casings, and two NOCI R .9 millimeter Logan casings — that she col *430 lected at the crime scene. Ms. Cunningham testified that she collected a firearm and magazine containing twelve- live rounds from Mr. Alexander’s bedroom. She also identified spent casings and bullet fragments that she collected from outside window where the shooting occurred.[3]
I ^Sergeant Marc Boudreaux, NOPD forensic firearms examiner, performed ballistics testing on the nine casings retrieved from the crime scene and the weapon found in the victim’s residence. He testified that the results indicated that more than one weapon was used in the shooting — four .45 caliber cartridge casings were fired by the same weapon and two of the .9 millimeter cartridge casings retrieved were fired from a different weapon, although neither of the two weapons used were retrieved. He further testified that a .38 caliber class bullet, which is consistent with a .9 ..millimeter, was retrieved from Ms. Washington’s body. Sergeant Boudreaux determined that only one of the .9 millimeter casings, which was found in the rear of the victim’s residence “near [the] pool,” was fired from the .38 caliber class weapon retrieved from the victim’s residence.[4]
Di\ 'Samantha Huber, Chief Forensic Pathologist in the' Orleans Parish Coroner’s Office, performed the autopsy on Ms. Washington’s body. She testified that Ms. Washington sustained four gunshot wounds to her torso. Dr. Huber further testified that the fatal wound was inflicted by the bullet that entered her upper left chest, passed through both lungs and the top of the heart, and lacerated the liver.

The witnesses

Mr. Alexander testified that the deceased victim, Ms, Washington, was his girlfriend in October 2012. On October 1, 2012, he and Ms. Washington were watching television in his bedroom in Little Woods area where he lived with his mother, Ms. Muse. Mr. Alexander testified that after hearing tap on the outside of |»his bedroom window,[5] he pulled some of the blinds down and looked- through the window. He testified that he saw Mr. Washington and Mr. Jackson[6] began shooting into his bedroom. Mr. Alexander attempted to push Ms. Washington out of the way and grabbed his gun which was located on his bed,[7] Unable to shoot his gun after sustaining three gunshot wounds, Mr. Alexander attempted to run from his bedroom and collapsed in his mother’s arms. Mr. Alexander testified that his mother then placed him on her bed and went to check on Ms. Washington.
Mr. Alexander further testified that he did not recall speaking' to police on the night of the shooting, but he did tell his stepbrother and EMS personnel that Jeffery Washington shot him. Mr. Alexander was later transported to the hospital, where he remained for approximately one month. Shortly after arriving at the hospital, he slipped into a coma, which lasted *431 about two weeks. When his condition improved, Mr. Alexander informed Deteetive Hamilton that Mr. Jackson was the second shooter. He recalled drawing a sketch of Mr. Jackson and identifying Mr. Jackson from a photo lineup.
At trial, Mr. Alexander testified that around 8:00 or 9:00 p.m. on the Friday before the shooting, he was with Chanqu-iell “Quielly” Watts[8] at her house in Little |7Woods, along with Mr. Washington, Mr. Jackson, and Davonna “Vee” Franklin. He testified that he argued' with Mr. Washington regarding Ms. Watts’ brother’s gun, which he claimed Mr. Washington had taken from the Watts’ -residence. Ms. Watts asked everyone except Mr. Alexander to leave.. Later, Mr. Washington called Mr. Alexander to inform him that they were no longer friends. At trial, Mr. Alexander identified Mr. Washington and Mr. Jackson as the two individuals he saw standing outside his bedroom on the night of the shooting.
. Ms. Muse testified that she was living with her son, Mr. Alexander, at the Branch Street residence on the night of the shooting. After hearing eight or nine gunshots, Ms. Muse testified that she left her room, crossed the hallway, and started toward her son’s room. He opened his bedroom door and collapsed in her arms. Ms. Muse testified that she noticed he was bleeding profusely. She placed him on her bed and called 911.[9] During the 911 call, Ms. Muse handed the phone to her stepson while she checked on Ms. Washington, who had not moved from Mr. Alexander’s bed.- Ms. Muse did not see the shooters. She testified that later that morning, she relocated to the police station and viewed a photo lineup from which she identified the picture of Mr. Washington.
Ms. Watts testified at trial that she has been Mr. Alexander’s girlfriend for about four years. She knew Mr. Washington through her brother and Mr. Alexander. Although she was not acquainted with Mr. Jackson, Ms; Watts met him | 8at her house on one occasion. She further testified that a few days before the shooting occurred she witnessed an argument between Mr. Washington and Mr... Alexander., Mr. Jackson and Ms. Franklin also were there at her mother’s house when the argument started. Ms.' Watts stated that the argument was over her brother’s gun, which Mr. Washington allegedly had taken from the Watts’ residence. Ms. Watts testified that she asked everyone excépt Mr. Alexander to leave. Thereafter, Mr. Washington called to inform Mr. Alexander that they were no longer friends and that he had.no ill feelings toward Mr. Alexander.
At trial, Ms. Franklin corroborated Ms. Watts’ testimony regarding the argument at the Watts’ residence a few days before the shooting. Ms. Franklin, when recalled to testify by the State, stated that she was friends with Mr. Washington and Mr. Alexander. She further testified that she was romantically involved with Mr. Jackson in October 2012 and that she exchanged text messages with him. . She also stated that she received approximately ten phone calls from Mr. Washington after he was arrested. In one of those phone calls, Mr. Washington told her to tell his “little partner” that he “got a yeah.”[10] Ms. *432 Franklin claimed that Mr. Washington was referring to their friend “Turk” but that she did not know what “got a yeah” meant.
Gail Jennings, Mr. Alexander’s grandmother, testified at trial that after she learned that Mr. Alexander was shot, she went to the hospital where he was taken. IflWhile at the hospital, she saw Mr. Washington, and she accused him of shooting her grandson. Ms. Jennings testified that Mr. Washington denied being the shooter and then he left the hospital. On cross examination, Ms. Jennings admitted that she had no firsthand knowledge that Mr. Washington was the shooter.
Margaret Washington testified that the deceased victim was her eighteen year old daughter, Marguerite. She testified that she and her daughter were not related to the defendant, Mr. Washington, nor was she aware that her daughter was dating Mr. Alexander. At the time of her death, Ms. Washington was a freshman at Dillard University. Mrs. Washington testified that she saw her daughter for the last time on September 30, 2012. At about 7:10 a.m. the following day, police informed Ms. Washington that her daughter was shot and killed.

DISCUSSION

Mr. Jackson’s Assignment of Error Number One

In his first assignment of error, Mr. Jackson contends that there is insufficient evidence to support his convictions for second degree murder and attempted second degree murder. We address this assignment first in accordance with the well-settled jurisprudential rule that “ ‘[wjhen issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence.’” State v. Miner, 14-0939, p. 5 (La.App. 4 Cir. 3/11/15), 163 So.3d 132, 135, writ denied, 15-0651 (La.2/26/16), 187 So.3d 466 (quoting State v. Hearold, 603 So.2d 731, 734 (La.1992)).
[inIn evaluating whether the evidence is sufficient to support a conviction, appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Appellate courts “must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the Defendant guilty beyond a reasonable doubt.” Miner, 14-0939 at p. 5, 163 So.3d at 135-36; see also State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). This court has set forth the well-settled standard of review applicable to a sufficiency of the evidence claim as follows:
[T]he reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
*433 In addition,' when circumstantial evidence forms the basis of the conviction, such evidence- must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro,-431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La, R.S. 15:438. This is not a separate test from Jackson v. Virginia,. supra, but. rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
In State v. Watkins, 13-1248, pp. 13-14 (La. App. 4 Cir. 8/6/14), 146 So.3d 294, 30203 (quoting State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111).
Addressing the credibility of witnesses, this court noted in State v. Barbain, 15-0404, pp. 8-9 (La.App. 4 Cir. 11/4/15), 179 So.3d 770, 776-77, units denied, 15-2179, 15-2213 (La.4/4/16), 191 So.3d 578, 190 So.3d 1201, the following:
The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. State v. Brown, 12-0853, p. 2 (La.App. 4 Cir. 2/6/13), 109 So.3d 966, 968 (citing State v. Holmes, 06-2988, p. 34 (La.12/2/08), 5 So.3d 42, 68; State v. Vessell, 450 So.2d 938, 943 (La.1984)). “It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence.” State v. Richards, 11-0349, p. 9 (La.App. 4 Cir. 12/1/11), 78 So.3d 864, 869 (citing State v. Cummings, 668 So.2d 1132 (La. 1996); State v. Rosiere, 488 So.2d 965, 968 (La,1986)). .
In' the absence of internal contradiction or an irreconcilable- conflict with the physical evidence, a single witness’ testimony, if believed by the fact finder, is sufficient to support a factual conclusion. State v. Rapp, 14-0633, pp. 6-7 (La.App. 4 Cir. 2/18/15).; 161 So.3d 103, 108 (citing State v. Marshall, 04-3139, p. 9 (La.11/29/06), 943 So.2d 362,- 369). When there is conflicting testimony abput factual matters, the resolution of which depends upon a determination of credibility of the witness, the matter is one of the weight of the evidence, not its sufficiency. State v. Edgar, 12-0744, p. 16 (La.App. 4 Cir. 9/18/13), 140 So.3d 22, 34 writ denied, 13-2452 (La.4/4/14), 135 So.3d 638 (citing State v. Allen, 94-1895, p. 7 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078, 1084).
A positive identification by only one witness is sufficient to support a conviction. State v. Everett, 11-0714, p. 15 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 619 (citing State v. Leger, 05-0011, p. 92 (La.7/10/06), 936 So.2d 108, 170); see also Mussall, 523 So.2d at 1311. When the. identity of the defendant as the perpetrator is 112disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson, See State v. Galle, 11-0930, p. 31 (La.App. 4 Cir. 2/13/13), 107 So.3d 916, 935; Everett, 11-0714 at p. 15, 96 So.3d at 619.
Mr. Jackson contends that the evidence presented at trial was insufficient to support his convictions. He maintains that the State failed to prove he was a shooter. Mr. Jackson contends that the only evidence produced by the State linking him to these crimes was Mr. Alexander’s identification of him, which occurred over seven weeks after the shooting. He further ar *434 gues that ■ Mr. Alexander’s identification was based on his association with the co-defendant, Mr. Washington, and on neighborhood rumor as opposed to fact. Mr. Jackson argues that the facts surrounding the identification of Mr. Jackson are as bizarre as the facts of Mussall, supra, suggesting that, the identification was fabricated. He thus contends that the identification should not be found sufficient to sustain the guilty verdicts.
Contrary to Mr. Jackson’s contentions, there was sufficient evidence adduced at trial to support his convictions. Mr. Jackson’s argument goés to Mr. Alexander’s credibility, not to the sufficiency of the evidence. As discussed, an appellate court shall not assess the credibility of witnesses when reviewing the evidence for sufficiency. See Barbain, supra. Although it was nearly two months after the incident whén Mr. Jackson identified as one of the shooters, Mr. Alexander was hospitalized for approximately one month due to his extensive | ¡.¡injuries.[11] For two weeks following the shooting, he was in a coma. Mr. Alexander testified that on the night of shooting, the assailants hesitated before shooting. Since the exterior of his residence was lit by street lights, he stated he had a clear view of Mr. Washington and Mr. Jackson’s faces. During his statement to Detective Hamilton, Mr. Alexander drew a sketch of Mr. Jackson, accurately depicting several of Jaekson’s facial tattoos at the time of the Shooting. Mr. Alexander testified that he was certain of his identification of his assailants. , On cross examination, he testified that he and Mr. Washington stopped spending time together shortly after Mr. Washington befriended Mr. Jackson. Once Mr. Washington and Mr. Jackson became friends, then they acted like “they didn’t want to give it [the stolen .gun] back.” Mr. Alexander further testified that Mr. Jackson influenced Mr. Washington; “before Myron [Jackson] came in the picture, Jeff [Washington] wasn’t worried about taking no gun from us, wasn’t worried about taking that gun at all.” .
Mr. Jackson’s reliance on the Mussall case to suggest that the identification was fabricated is misplaced. In Mussall, the State did not introduce any evidence to corroborate the victim’s testimony— “[t]here was no other witness to the robbery itself or to any fact in Siebenkittel’s [the victim]' version of his prior contact with Mussall [the defendant].” Mussall, 523 So.2d at 1307. Here, the State' introduced evidence to corroborate Mr. Alexander’s testimony. The ballistics evidence offered |14by Sergeant Boudreaux proved that two weapons — neither of .which belonged to Mr. Alexander — were used in the shooting. Through Mr. Jackson’s cell phone records, the State established Mr. Jackson’s presence near the victim’s residence in Little Woods around the time the shooting occurred. Furthermore, the testimony ,of Ms. Franklin and Ms. Watts confirmed that a few days before the shooting Mr. Alexander was involved in an argument with Mr. Washington over Ms. Watts’ brother’s gun and that Mr. Washington and Mr. .Jackson were asked to leave.
Viewing the evidence in the light most favorable to the State, the jury was not unreasonable in concluding that Mr. Jackson was guilty of second degree murder and attempted second degree murder. This assignment of error is yrathout merit.

*435
Mr. Washington’s Assignment of Error Number Two and Mr. Jackson’s Assignment of Error Number Four

In their respective assignments of error, Mr. Washington and Mr. Jackson contend that the district court abused 'its discretion by denying Mr. Washington’s motion to continue.
The record indicates that on Jánuary 13, 2015, counsel for Mr. Washington filed a motion to continue, citing a dental infection as grounds for the continuance. According to counsel’s motion, the infection caused severe pain, for which he was taking medication. He represented that he was still unable to obtain relief, that he was suffering from lack of sleep, and that his condition inhibited his ability to provide effective assistance of counsel.
| ^According to the minute entries, there was no ruling on the motion to continue. Rather, in a letter to this court dated September 2, 2015, the district court judge’s law clerk stated that the judge was not given notice that defense counsel would be seeking a continuance and that no courtesy copy of the motion was given to the judge. The letter further stated that the judge was first made aware of the motion on the morning of trial, and the judge denied the motion in open court.[12]
The trial transcript indicates that on the morning of January 23-, 2015, which was the fourth day of trial, the district court judge held a conference in chambers with all parties to address defense counsel’s concern that his dental condition was impairing his effectiveness at, trial. The district court judge explained that she previously denied his motion for continuancé because counsel failed to attach any medical records to the motion.[13] Moreover, the judge stated that she had observed defense counsel for three days of trial. The judge noted that on the evening of the third day of trial, defense counsel first complained about his ability to perform, and. at that time, the district court recessed until the next morning.
. “A motion for continuance, if timely filed, may be granted in the discretion of the .court, in any case if there is good ground therefore.” La.C.Cr.P. art. 712. Generally, a motion for continuance shall be in writing, specifically allege the grounds upon which it is based, and it shall be filed at least seven days prior to the | ^commencement of trial. La.C.Cr.P. art. 707, However, upon written motion at any time and after contradictory hearing, a continuance may be granted upon a showing that granting the motion is in the interest of justice. Id.
“The trial court is vested with considerable discretion in ruling on a motion for continuance, and the reviewing court will not disturb the trial court’s ruling absent a clear abuse of discretion.” State v. German, 12-1293, p. 24 (La.App. 4 Cir. 1/22/14), 133 So.3d 179, 197, writ denied, 14-0396 (La.11/26/14), 152 So.3d 897 (citing State v. Brown, 12-0626, p. 16 (La. App. 4 Cir. 4/10/13), 115 So.3d 564, 575; State v. Reeves, 06-2419, p. 73 (La.5/5/09), 11 So.3d 1031, 1078). Furthermore, a reviewing court should generally decline to reverse a conviction even on a showing of an improper denial of a motion for a continuance absent a showing of specific prejudice. German, supra (citing Reeves, 06-2419 at p. 73,11 So.3d at 1079).
*436 Mr. Washington and Mr. Jackson contend that they were prejudiced by the district court’s failure to grant counsel’s motion for continuance as counsel was unable to render effective assistance due to his medical condition. They further contend that that counsel’s medical condition was a “good ground” for a continuance and that they suffered specific prejudice from counsel’s impaired performance at trial. Mr. Washington and Mr. Jackson claim that counsel became confused during his cross examination of Detective Hamilton regarding the notations on the cell phone records. Mr. Washington further argues that he was prejudiced because counsel was “unable to effectively confer with [Mr. | ^Washington] on issues that surfaced and were developed during the course of trial, including but not limited to whether or not to offer, accept, or reject a proposal to plea after certain witnesses have testified and/or certain evidence was admitted above the defense’s objection.”
In addition, Mr. Jackson argues that the district court abused its discretion by not granting a mistrial due to defense counsel’s illness. As Mr. Jackson point out, a mistrial may be granted when it is physically impossible to proceed with a trial. La.C.Cr.P. art. 775(5). “Mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice by the defendant.” State v. Coleman, 12-1408, p. 12 (La.App. 4 Cir. 1/8/14), 133 So.3d 9, 20 (citing State v. Leonard, 05-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667). Actual prejudice must be shown; the mere possibility of prejudice is insufficient to warrant a mistrial. Id,.
Based on our review of the record, we cannot conclude the district court abused its discretion in denying Mr. Washington’s motion for continuance. Nor do we find the defendants were prejudiced by the denial of the motion for continuance. As the State points out, Mr. Washington was represented by two attorneys, and only one of his attorneys claimed to be impaired by a dental issue. Furthermore, defense counsel participated in voir dire, cross examination, and closing argument; he also voiced several objections throughout the trial. We therefore find that Mr. Washington and Mr. Jackson failed to establish that their cases were impaired by the denial of the continuance. Thus, Mr. Washington and | tfiMr. Jackson have not shown any specific prejudice. This assignment of error is without merit.

Mr. Washington’s Assignment of Error Number One

In his first assignment of error, Mr. Washington contends that the district court abused its discretion by denying his motion for mistrial after there was an overnight delay between his counsel’s closing arguments and the State’s rebuttal argument. He argues that the delay between the arguments violated his constitutional rights — his right to a fair trial under the Fifth Amendment of the United States Constitution, and his right to assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 13 of the Louisiana Constitution.
An unusual situation occurred during the trial that is the basis of this argument. On January 23, 2015, which was the fourth day of trial, Mr. Washington’s counsel concluded his closing argument. Thereafter, in the middle Mr. Jackson’s counsel’s closing argument, the electricity went out in the courthouse. For that reason, the proceedings were concluded for the day. On the following morning, Mr. Washington’s counsel moved for a mistrial, arguing as follows:
[Mr. Washington’s defense counsel] did his opening last night. There’s been over twelve hours obviously since he did *437 ... his closing last night. And since [Mr. Jackson’s defense counsel] will finish his and the State will start theirs, we think it’s unfair and unfairly prejudicial, and these are grounds for mistrial, that Mr. Washington’s closing statement will have this long break, and the State will be able to give a closing just minutes before the deliberation starts.
haAfter denying Mr. Washington’s motion for a mistrial, the district court judge noted as follows:
And I do want to note that as to the first ground you stated about [defense counsel’s] elosiiig argument, we will note that everyone here is at the same point, no one is at any more of an advantage or disadvantage than anyone. This was an unforeseen incident that .not only occurred in this building but for blocks down the street, and the jury has been, you know, they’ve been attentive this entire time. And more importantly, closing arguments are not evidence, and the court will instruct the jury of just that ... .
“[A] mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial.” La.C.Cr.P. art. 775. Granting a mistrial is “a drastic remedy which should only be declared upon a clear showing of prejudice by the defendant.” Coleman, supra.
Mr. Washington contends that the delay essentially denied him of a closing argument. We disagree. In State v. Williams, 594 So.2d 476, 479 (La.App. 4th Cir.1992), after the first day of trial — when testimony was presented and arguments were made — the court closed due to a bomb threat. ' Five days later, the trial resumed, and the court charged the jury. Id. In Williams, the defendants argued that a five-day delay was too long to allow the jury to keep the evidence and arguments in mind. Rejecting that argument, this court reasoned that the facts were not complex, the evidence was clearly presented,- and there was no showing that defendants were prejudiced by delay; Id.
■ A review of the record reveals that the district court did not abuse its discretion in denying Mr. Washington’s motion for mistrial. As in Williams, supra, UnMr. Washington has not shown that he was prejudiced by the delay between closing arguments. In addition, he failed to cite any authority in support of his assertion that the delay is akin to the denial of summation. • This assignment of error is without merit.

Mr. Jackson’s Assignment of Error Number Two

In his second assignment of error, Mr. Jackson contends that the district court erred in allowing Detective Hamilton to interpret Mr. Washington and Mr. Jackson’s cell phone records when he was not qualified as an expert in that field. He argues that Detective Hamilton was permitted to draw conclusions regarding the data contained in the cell phone records, such as when the cell phone was moving from one location to another. Mr. Jackson further maintains that the conclusions drawn by Detective Hamilton were based upon the records he received from the telephone companies, "not on any personal perceptions.
The testimony of a lay witness, who is not testifying as an expert, in the form of opinions or inferences is limited to those opinions or inferences that are rationally based on the perception of the witness and are helpful to a clear understanding of the testimony or the determination of a fact in issue. La. C.E. art. 701. It is well-settled that law officer may testify as to matters within his personal knowl *438 edge acquired through experience without first being qualified as an expert. State v. Griffin, 14-251, p. 21 (La.App. 5 Cir. 3/11/15), 169 So.3d 473, 487 (citing State v. LeBlanc, 05-885 (La.App. 1 Cir. 2/10/06), 928 So.2d 599, 603).
|aiMr.. Jackson contends that determining location by the use of cell phone records is a subject for expert analysis. State v. Saltzman, 13-276 (La.App. 3 Cir. 10/23/13), 128 So.3d 1060. In Saltzman, an agent of the Federal Bureau of Investigations testified as an expert regarding the use of historical cell site analysis.[14] The agent testified that “[t]o be an expert in historical cell site analysis, one needs to have: 1) knowledge of how a cell phone network operates; 2) experience in going through volumes of call detail records; and 3) practical experience in geolocating a cell phone that is‘attached’ to a human being.” Saltzman, 13-276 at p. 69, 128 So.3d at 1103.
Furthermore, in State v. Morgan, 12-2060 (La.App. 1 Cir. 6/7/13), 119 So.3d 817, a similar issue was addressed. In Morgan, a police officer was allowed to testify to the data collected from the use of á cellular telephone. Morgan, 12-2060 at p. 14, 119 So.3d at 827. The appellate court noted as follows:
Detective Dilworth explained that he easily determined how to interpret the phone records, noting that he may have called the telephone company as a precaution, but that the records were self-explanatory and included headings such as “called number” to indicate the telephone that received the call, and “dialed digits” to indicate a call that was made. As routinely done, .the cell phone companies provided a spreadsheet that listed the corresponding numbers used to identify towers and- the address and GPS coordinates of the tower that the cell phone used when a call was made.
Id. The appellate court held that a police officer is not required to have expert knowledge regarding the interpretation and explanation of cell phone records. Id, 122“A lay witness can infer and tell the jury what cell tower accepted the mobile phone signals at specific times based on that witness’s examination of cell phone records.” Id. The appellate court found no error in the trial court’s ruling that the detective was able to explain cell phone records regarding calls made and received and cell phone tower locations. Id.
In the present case, Detective Hamilton admitted he was not an expert in cell phone tower locations and ranges; rather, he was testifying regarding the information supplied to him by the cell service provider that he used during his investigation. Detective Hamilton testified that the cell phone service providers supplied him with Mr.- Washington and Mr.- Jackson’s cell phone records, which included the calls made and' the cell phone towers used. Detective Hamilton compared the cell towers used by Mr. Washington and Mr, Jackson to a ledger supplied by the service providers, which identified the geographical areas in which the cell towers were located.
As in Morgan, Detective Hamilton was not required to determine the location of cell towers; rather, the cell service providers provided that information to him. Detective Hamilton explained which cell towers accepted the cell phone signals from *439 Mr. Washington and Mr. Jackson’s cell phones at specific times based on; his- examination of the cell phone records. Thus, we • find that- the district court did not abuse its discretion in allowing Detective Hamilton .to testify as to the calls made and received and the tower locations for the telephone - calls; Accordingly, .this assignment of error is without merit.
[ 2°Mr. Jackson’s Assignment of Error Number Three
In his third assignment' Of error, Mr. Jackson contends that the trial court abused its discretion by' admitting' into evidence his videotaped statement to Detective Hamilton, which the State redacted by muting certain portions. Mr. Jackson argues that the statement was not probative of,any fact at issue. Rather, the State only admitted it as a conduit for introducing Mr. Jackson’s character into evidence.[15] Furthermore, Mr. Jackson argues that the statement was not a confession or overtly inculpatory; thus, the prejudicial impact outweighed the probative value of evidence.
Generally, evidence of other crimes and bad acts is inadmissible. La. C.E. art. 404(B).[16] However, “[e]very confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford.” La. R.S. 15:450, Nevertheless, if the State seeks to introduce a statement which contains refer-enees to other crimes or bad acts, “the defendant has two choices: he may either exercise his right to have the confession ^introduced in its entirety, or he may request that the trial court excise- all references to other crimes. The. defendant does not have the option of keeping the whole statement out, unless the statement is in itself inadmissible.” State v. Pendelton, 96-367, pp. 11-12. (La.App. . 5 Cir. 5/28/97),. 696 So.2d 144, 151-52 (citing State v. Bourque, 622 So.2d 198 (La.1993); State v. Glynn, 94-0332 (La.App. 1 Cir. 4/7/95), 653 So.2d 1288; State v. Vinet, 529 So.2d 1334 (La.App. 5 Cir.1988)); State v. Blank, 04-0204, pp,. 50-51 (La.4/11/07), 955 So.2d 90, 131-32.
In his voluntary statement, Mr. Jackson explained that he and Mr. Washington had been friends for several years. He stated they re-established their friendship after Mr. Jackson was released from jail. Mr. Jackson’s statement included details of his relationship with Ms. Franklin. He also explained his actions in the days before the shooting, including where- he was when certain calls were made, After the statement was played for the jury, the district court judge explained that “at the request of the attorneys, I am going to explain to you that portions of [Mr. Jackson’s statement] had to be muted because that is not for, the jury.”
•Mr. Jackson contends that both the redaction and the district court judge’s com *440 ment to the jury were prejudicial to his defense. Although Mr. Jackson concedes that statement was redacted to exclude other crimes evidence, he contends that the jury could easily infer that the redacted portions involved other criminal conduct or gang involvement.
| gfiBased on the totality of the circumstances, we do not find that the district court abused its discretion when it allowed the introduction of Mr. Jackson’s redacted statement. Mr. Jackson’s statement was properly admitted under La. R.S. 15:450 with reference to other crimes redacted. At the request of counsel, the judge instructed the jury regarding the muted portions of the statement. Furthermore, the edited version is not prejudicial to Mr. Jackson. Thus, we find no error in the district court’s admission of the edited version. This assignment of error is without merit.

Mr. Jackson’s Supplemental Assignment of Error Number One

In his first supplement assignment of error, Mr. Jackson contends that the provision of the Louisiana Constitution allowing non-unanimous jury verdicts violates the Sixth and Fourteenth Amendments to the United States Constitution. Specifically, Mr. Jackson contends that the non-unanimous verdicts violate the Equal Protection Clause because the provision’s enactment was motivated by an express and overt desire to discriminate against blacks on account of race.
This court has already addressed these issues. State v. Lambert, 15-0886 (La. App. 4 Cir. 1/20/16), 186 So.3d 728; State v. Mack, 12-0625, (La.App. 4 Cir. 5/6/15), 162 So.3d 1284. In Lambert, supra, this court held as follows:
[Ojur present jurisprudence provides that non-unanimous verdicts in noncapi-tal felony cases do not violate the Sixth and Fourteenth Amendments. Defendant makes no persuasive argument that non-unanimous verdicts in noncapital felony cases calling for mandatory life sentences without parole upon conviction call for a different result. Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); McDonald v. City of Chicago, 561 U.S. 742,130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)(recognizing Apo-daca ’s continuing viability); State v. Bertrand, 2008-2215 (La.3/17/09), 6 So.3d 738; State v. Curtis, 2011-1676 (La.App. 4 Cir. 3/13/13), 112 So.3d 323. Accordingly, this assignment of error is without merit.
Lambert, 15-0886 at p. 16, 186 So.3d at 739 (citing Mack, 12-0625 at pp. 4-5, 162 So.3d at 1287-88); see State v. Bertrand, 08-2215, 08-2311 (La.3/17/09), 6 So.3d 738 (finding that non-unanimous jury verdicts were not unconstitutional); State v. Hammond, 12-1559 (La.App. 1 Cir. 3/25/13), 115 So.3d 513 (holding that non-unanimous jury verdicts did not violate the defendant’s right to a jury trial and to the equal protection of the laws, despite contention that enactment of source provision was motivated by an express and overt desire to discriminate on the basis of race); see also State v. Wilmot, 13-994, p. 8 (La.App. 5 Cir. 5/14/14), 142 So.3d 141, 147. Thus, this supplemental assignment of error is without merit.

Mr. Jackson’s Supplemental Assignment of Error Number Two

In his final assignment of error, Mr. Jackson also argues that the non-unanimous verdicts violate his right to a jury trial under the Sixth and Fourteenth Amendments to the United States Constitution, thereby denying him due process. Mr. Jackson, however, concedes the issue is foreclosed by Bertrand, supra. He further concedes that he raised this issue in order to preserve it for further review by *441 the United States and Louisiana Supreme Courts. Accordingly, this supplemental assignment of error is without merit.

DECREE

For the foregoing reasons, we affirm the convictions and sentences of Mr. Washington and Mr. Jackson.
AFFIRMED

. As we do in every criminal case, we have reviewed the record for errors patent and found none.

. Detective Garcia recalled that three spent casings were collected near a tree outside of the bedroom where Ms. Washington was found, and bullet fragments were found inside the bedroom.

. Ms. Cunningham also collected a clear plastic bag of marijuana and a potted plant from Mr. Alexander’s bedroom.

. The remaining two casings were too badly damaged to provide any information,

. According to Mr. Alexander, only a few of his friends knew where he lived and knew to tap on his window late at night in order to not wake up his mother.

. Mr. Alexander testified that he was friends with Mr. Washington for about four or five years and that he only knew Mr. Jackson through his association with Mr. Washington.

, Mr. Alexander testified that on October 9, 2013, he pled guilty to a federal indictment for possession of a handgun and illegal substance. In exchange for his guilty plea, Mr. Alexander agreed to testify truthfully in all court matters.

. At trial, Mr. Alexander testified that Ms. Watts was his current girlfriend' and the mother of his child.

. At trial, the 911 recording was played for the jury. The 911 recording and incident recall document were authenticated by Shata-sha Johnson, an operator and records custodian with the New Orleans Police Department (“NOPD”) Communications Department.

.At trial, Mr. Washington’s jail house call was played for the jury. The recording and call detail sheet were authenticated by Deputy Jim Huey, records custodian of the Orleans *432 Parish Criminal Sheriffs communication division.

. At trial, Mr. Alexander testified that he was shot three times — once near His groin, once in the leg, and one bullet grazed his arm. One of the wounds severed his femoral artery in his leg, causing rapid and massive blood loss. Mr. Alexander also testified that he went into cardiac arrest and that his chest was cracked open to massage his heart.

. The record does not contain a transcript of the hearing on the motion to continue,

. The judge disclosed to the parties that on the Saturday before the commencement of trial, the judge and defense counsel separately attended the same wedding and noticed that counsel did not exhibit any signs of impairment.

. The agent defined "historical cell site analysis” as "the act of taking call detail records from one's cellular telephone and taking that information, which is the cell site that is utilized by the phone for service, and taking that and creating a mapped projection as to where that geographical area that that cell site covers,” Saltzman, 13-276 atp. 68, 128 So.3d at 1102.

. On January 20, 2015, the district court granted Mr. Jackson's motion in limine to exclude character evidence except as rebuttal evidence if the defense "opened the - door.”

. La. C.E. art. -404(B)(1) provides as follows:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a. person in order to show that he acted in conformity therewith. It may, however, - be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided' that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.