PATRICIA RIVET MURRAY, Judge.
 

 Ijn this criminal appeal, the defendant, Roger Richards, raises two issues. First, he contends that the evidence is insufficient to support his conviction for aggravated rape. Second, he contends that the district court’s imposition of the mandatory sentence of life without parole is unconstitutionally excessive because he was a seventeen year old juvenile at the time of the offense. In support, he cites
 
 Graham v. Florida,
 
 560 U.S.-, 130 S.Ct. 2011,
 
 *866
 
 176 L.Ed.2d 825 (2010). For the reasons that follow, we affirm Mr. Richards’ conviction and amend his sentence with instructions.
 

 STATEMENT OF THE CASE
 

 On July 17, 2008, the State charged Mr. Richards with aggravated rape by vaginal penetration of a victim under the age of thirteen, a violation of La. R.S. 14:42. On August 13, 2008, Mr. Richards was arraigned and pled not guilty. The State filed various pre-trial motions; the defense filed none. In April 2009, Mr. Richards was ordered to provide saliva samples.
 

 |2In October 2010, a three-day jury trial was held; and Mr. Richards was found guilty as charged. On November 16, 2010, the district court denied the defense motions in arrest of judgment and for a new trial. On the same date, the district court sentenced Mr. Richards to life without benefit of probation, parole, or suspension of sentence. The district court denied the defense motion to reconsider the sentence. This appeal followed.
 

 STATEMENT OF THE FACTS
 

 In October 2007, the eight year old victim, L.A., whose date of birth is April 26, 1999, lived on Thalia Street in New Orleans, with her mother, T.A., and her two uncles, Christopher and Nicholas Joseph.
 
 [1]
 
 Mr. Richards lived next door. On the date of the incident, L.A. was at home with her cousin Ray Allen when Mr. Richards came over to her house. Mr. Allen was working on the computer, which was located in the hallway; and L.A. was sitting on the sofa. Mr. Richards sat next to L.A. on the sofa. He asked her to go put on a DVD, which would have required her to go to her bedroom where the DVD player was located. According to L.A., she did not want to go to her bedroom because she knew what would happen. When she refused to go to her bedroom on her own, Mr. Richards dragged her to the bedroom and locked the door. He then removed the Disney jeans that L.A. was wearing, pulled down his pants, and got on top of her. According to L.A., something got on her Disney jeans. Fearing that her mother would get mad at her | ¡¡for staining her jeans, she took off her jeans and hid them in a plastic Wal-Mart bag on top of her closet.
 

 L.A., who was eleven at the time of the trial, testified that she did not tell anyone what happened until seven months later when her mother found the jeans. In response to her mother’s questions regarding what happened, L.A. testified that she told her mother that “Roger” had “raped” her. She further testified that she knew Roger Richards
 
 from when
 
 she was small, that he was friends with her uncles, and that he would sometimes hang out with her uncles at her house. She still further testified that she understood the difference between the truth and a lie. L.A. stated that she told Dr. Adrienne Atzemis, the child abuse pediatrician, the truth about what Mr. Richards had done to her. In court, she identified a picture depicting his actions that she had drawn for Dr. Atzem-is. She also identified both her jeans and Mr. Richards.
 

 T.A., LA’s mother, corroborated L.A.’s testimony regarding first learning about the incident seven months later when she found L.A.’s blood-stained Disney jeans. On April 16, 2008, T.A. was cleaning the house when she found the jeans. She confronted L.A. and asked her if she had started her menstrual period. L.A. responded in the negative. T.A. next asked L.A. if somebody had touched her. L.A.
 
 *867
 
 responded “Roger.” T.A. then asked L.A. when this had occurred. L.A. responded that it happened on the same day she told her mother that she was burning between her legs. (On that day, October 3, 2007, T.A. took L.A. to Children’s Hospital where she was treated for a urinary tract infection.)
 

 |4On April 16, 2008, immediately after learning what had occurred with Mr. Richards, T.A. brought L.A. to Children’s Hospital. At the hospital, T.A. and L.A. met with New Orleans Police Department (“NOPD”) Detective Journay Ross. T.A. gave L.A.’s blood-stained Disney jeans to Detective Ross. In the emergency room, the treating physician documented in the “HISTORY” portion of the “Emergency Department Record” that L.A. had “admitted to [her] mother that ‘Roger’ had touched her b/t [between] her legs and stuck his private part inside of her & that he was on top of her.” The doctor further documented that L.A. told her mother that Roger had done this on “that day when between my legs was burning and you brought me to the hospital.” The doctor still further documented that L.A. previously was seen at Children’s Hospital on October 3, 2007. On that date, she was diagnosed with a urinary tract infection, prescribed Bactrim, and sent home.
 

 The hospital records further reflect that during the April 16, 2008, hospital visit L.A. was tested for sexually transmitted diseases and tested positive for one — chlamydia. On that visit, L.A. also was referred to see Dr. Atzemis.
 

 Dr. Atzemis, who was qualified as an expert in child abuse pediatrics, testified that on May 7, 2008, she met with and examined L.A. Dr. Atzemis testified that her routine is to speak with the victim before conducting a physical exam so that she can determine where to focus her attention. Dr. Atzemis testified that when she spoke with L.A. the child was hesitant to talk about what Mr. Richards had done to her and that the child would sometimes draw pictures depicting his actions. Dr. Atzemis identified a blow-up of one of the pictures that |5L.A. had drawn for her. Dr. Atzemis stated that L.A. told her that Mr. Richards had sexually abused her on more than one occasion. Dr. Atzemis further stated that L.A. described the following “multiple forms of contact” by Mr. Richards: he had her place her mouth on his private part, he fondled her, and he stuck his private part in her behind. Dr. Atzemis still further stated that L.A. told her that Mr. Richards had white stuff coming from his private part that landed on L.A.’s pants when he was lying on top of her.
 

 After talking with L.A., Dr. Atzemis conducted a physical exam of her. Although L.A.’s physical exam was normal, Dr. Atzemis explained that it was common to find no physical evidence of sexual abuse. She noted that this was especially true in this case given the length of time between the alleged abuse and the physical exam. She also noted that any tear that might have occurred would have healed quickly.
 

 Dr. Atzemis tested L.A. and confirmed that she no longer had vaginal chlamydia. Discussing L.A.’s prior diagnosis of chlamydia, Dr. Atzemis explained that chlamydia is a sexually transmitted disease that is first detected through a urine test. To confirm the diagnosis, a culture is taken from the vagina. Dr. Atzemis further explained that chlamydia could only be contracted when the infected area comes in direct contact with infected body fluids, such as semen. Dr. Atzemis thus concluded that L.A. had been sexually abused and that her contacting of chlamydia was consistent with intimate sexual contact.
 

 
 *868
 
 |r,Jodie Clements, who was qualified as an expert in the field of serology, testified that she was employed by the NOPD as a serologist and a criminalist. Ms. Clements testified that she tested L.A.’s Disney jeans and confirmed that the stain on them tested positive for seminal fluid and blood. She, however, was unable to confirm the presence of sperm. Based on her findings, she forwarded the samples for DNA testing.
 

 Shana Mills, who was qualified an expert in DNA analysis, testified that she was employed as a forensic biologist at Bode Technology in Virginia. Ms. Mills confirmed with a reasonable degree of scientific certainty that Mr. Richards was the contributor of the sperm found on L.A.’s jeans. Quantifying the certainty, she testified that the chance the contributor of the sperm was someone other than Mr. Richards was one in eighty-three quintillion among the United States African-American population.
 

 Pursuant to La. C.E. art. 412.2,
 
 [2]
 
 the State, over the defense’ objection, presented the testimony of K.P., who was born on July 2, 1993.
 
 [3]
 
 K.P. testified that |7in March 2008 Mr. Richards forcibly raped her. Mr. Richards was convicted of raping K.P. in an unrelated proceeding. K.P. testified that she did not know L.A.
 

 In his defense, Mr. Richards called three witnesses: Detective Ross; Christopher Joseph, L.A.’s uncle; and Jasmine Williams, Mr. Richards’ former girlfriend.
 

 Detective Ross, when called by the defense, testified that she could not recall without reviewing her report if Ray Allen, L.A.’s cousin, was in the house at the time of the incident in question. Likewise, she testified that if she questioned Ray Allen about the incident it would have been listed in her report. On cross-examination, Detective Ross testified that she took the bucal swab from Mr. Richards in court pursuant to a court order.
 

 Christopher Joseph, L.A.’s uncle, testified that Mr. Richards would sometimes come over to their house with his girlfriends; however, he had no knowledge of Mr. Richards ever having sex with his girlfriends while he was there. Mr. Joseph further testified that there was a computer in the hallway some distance from L.A.’s bedroom and that the door to her bedroom was not visible from the spot where the computer was located. Mr. Joseph still further testified that he left the house when only L.A. and Mr. Richards were present. Mr. Joseph compared Mr. Richards to a brother.
 

 Ms. Williams testified that she dated Mr. Richards for about three months in 2007. According to Ms. Williams, she and
 
 *869
 
 Mr. Richards had sex more than once at his cousin’s house on a bed that had clothes strewn all around.
 

 1
 
 ¡¿DISCUSSION
 

 ERRORS PATENT
 

 A review of the record for errors patent reveals one. Mr. Richards’ motions for new trial and in arrest of judgment were both denied on November 16, 2010; and he was sentenced on that same day. There is no indication that Mr. Richards waived the mandatory twenty-four hour delay between the denial of his motion for new trial and sentencing as provided by La.C.Cr. P. Art. 873. Nonetheless, the failure to observe the delay mandated by Article 873 is harmless error when the sentence imposed is a mandatory one.
 
 State v. Seals,
 
 95-0305 at p. 17 (La.11/25/96), 684 So.2d 368, 380 (noting that “[djelay or no delay, the sentence the judge was required to impose would have been the same.”) Such is the case here. Thus, the district court’s failure to observe the statutory delay is harmless error. Regardless, as discussed elsewhere, we find the sentence must be amended with instructions in light of the Supreme Court’s holding in
 
 Graham, supra.
 

 ASSIGNMENT OF ERROR NUMBER 1
 

 Mr. Richards’ first assignment of error is that the evidence was insufficient to convict him of aggravated rape. In
 
 State v. Brown,
 
 03-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18, the Louisiana Supreme Court set forth the following standard for reviewing a claim of insufficiency of evidence:
 

 When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court “must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all |3of the elements of the crime had been proved beyond a reasonable doubt.”
 
 State v. Neal,
 
 00-0674, (La.6/29/01), 796 So.2d 649, 657 (citing
 
 State v. Captville,
 
 448 So.2d 676, 678 (La.1984)).
 

 When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”
 
 Neal,
 
 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under
 
 Jackson
 
 to prove guilt beyond a reasonable doubt to a rational jury.
 
 Id.
 
 (citing
 
 State v. Rosiere,
 
 488 So.2d 965, 968 (La.1986)).
 

 It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence.
 
 State v. Cummings,
 
 668 So.2d 1132 (La.1996);
 
 State v. Rosiere,
 
 488 So.2d 965, 968 (La.1986). The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence.
 
 State v. Vessell,
 
 450 So.2d 938, 943 (La. 1984).
 

 In this case, Mr. Richards was convicted of aggravated rape. Aggravated rape is defined, in pertinent part, to mean a rape committed where the vaginal intercourse is deemed to be without the lawful consent of the victim because the victim is under the age of thirteen years. La. R.S. 14:42(A)(4). Rape is defined, in pertinent part, as vaginal sexual intercourse with a female person committed without the person’s lawful consent. La. R.S. 14:41(A).
 
 *870
 
 Emission is not necessary; and any sexual penetration, however slight, is sufficient to complete the crime. La. R.S. 14:41(B). The testimony of the victim alone is sufficient to establish penetration.
 
 State v. Hubbard,
 
 97-916, pp. 9-10 (La.App. 5 Cir. 1/27/98), 708 So.2d 1099, 1104.
 

 linMr. Roger contends that the State failed to established penetration, an essential element of the crime of aggravated rape. He points out that the indictment charged a violation by “vaginal intercourse.” He emphasizes that the only evidence of penetration that the State introduced was the victim’s testimony that Roger “raped” her. He further emphasizes the lack of evidence that the victim, who was eleven years old at the time of trial, knew what the generic term “rape” meant. He contends that this case is indistinguishable from
 
 State v. Marigny,
 
 532 So.2d 420 (La.App. 1st Cir.1988).
 

 In Marigny, supra,
 
 the appellate court found insufficient evidence to establish sexual intercourse when a fifteen year old girl, referred to as Ms. “A”, testified only that she and the defendant “had sex.”
 
 Marigny,
 
 582 So.2d at 422. The appellate court’s finding was premised on the lack of evidence; the court reasoned that:
 

 The only evidence introduced at trial relating to proof of sexual intercourse consists of Ms. “A” ’s testimony that she and the defendant “had sex” and the testimony of Ms. “A” ’s mother that Ms. “A” made the same statement to her. There was no evidence that Ms. “A” understood the phrase “had sex” to mean sexual intercourse.... Nor was any medical evidence of penetration presented, although it was stated by other witnesses that the alleged victim had been taken to at least two doctors in connection with this.
 

 Marigny,
 
 532 So.2d at 422. Based on its finding that the evidence was insufficient, the appellate court set aside the defendant’s conviction for carnal knowledge of a juvenile and entered the lesser included verdict of attempted carnal knowledge of a juvenile.
 

 In Contrary to Mr. Richards’ contention, the instant case is factually distinguishable from the
 
 Marigny
 
 ease. L.A.’s testimony that she was raped was not the sole evidence presented by the State of penetration. Although the State may not have established that L.A. understood the meaning of the term rape, it corroborated L.A.’s testimony with medical evidence that vaginal penetration took place. Dr. Atzemis testified that L.A.’s vagina was infected with chlamydia. Dr. Atzemis explained that the only manner in which L.A. could have contracted chlamydia was through intimate sexual contact during which an infected body fluid, such as semen, came into contact with her vagina. Other testimony regarding DNA testing established that the semen found mixed with the blood stain on L.A.’s jeans came from Mr. Richards. Finally, the Children’s Hospital medical records from the April 2008 emergency room visit indicate that the history provided to the examining doctor was that L.A. told her mother that Mr. Richards stuck his private part in her. Viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the offense of aggravated rape by vaginal penetration. This assignment of error lacks merit.
 

 ASSIGNMENT OF ERROR NUMBER 2
 

 Mr. Richards’s other assignment of error is that his sentence of life without parole is unconstitutionally excessive based on
 
 Graham v. Florida,
 
 560 U.S.-, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), because he was seventeen at the time he | ^committed the crime. He contends that
 
 *871
 
 this court should vacate his sentence and remanded this case for resentencing.
 

 In
 
 Graham, supra,
 
 the petitioner was sentenced to life without parole for an armed burglary committed in connection with a home invasion robbery. The day that the petitioner committed the crime “he was 34 days short of his 18th birthday” and on probation for a prior offense.
 
 Graham,
 
 560 U.S. at-, 130 S.Ct. at 2019, 176 L.Ed.2d at-. The petitioner argued that his sentence was excessive under the Eighth Amendment because he was a juvenile at the time of the offense and was one of approximately 109 juveniles in the United States serving life without parole for a non-homicide offense. Agreeing with this argument, the Supreme Court held that the Eighth Amendment “prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide.”
 
 Graham,
 
 560 U.S. at -, 130 S.Ct. at 2034, 176 L.Ed.2d at-.
 

 The Supreme Court in
 
 Graham
 
 adopted a categorical rule prohibiting the imposition of a life without parole sentence for juvenile non-homicide offenders. The Court explained that a categorical rule “is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment.”
 
 Graham,
 
 560 U.S. at -, 130 S.Ct. at 2030, 176 L.Ed.2d at -. The Supreme Court further explained that “[a] life without parole sentence improperly denies -the juvenile offender a chance to demonstrate growth and maturity.”
 
 Graham,
 
 560 U.S. at-, 130 S.Ct. at 2029, 176 L.Ed.2d at -. The Supreme Court thus held that a state must provide “some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.”
 
 Graham,
 
 560 U.S. at -, 130 S.Ct. at 2030, 176 L.Ed.2d at-,
 
 [4]
 

 The State contends that the categorical rule enunciated in
 
 Graham
 
 is not applicable to Mr. Richards’ sentence because Louisiana’s statutory scheme is different from the Florida statutory scheme that was at issue in
 
 Graham.
 
 The State contends that unlike Florida, which has abolished its parole system, the Louisiana parole system allows Mr. Richards, although sentenced to life imprisonment without benefit of parole, a meaningful opportunity to be released on parole by having his sentence commuted to a fixed number of years, as required by La. R.S. 15:574.4 for prisoners serving life sentences. This process, however, is dependent on an award of clemency by the governor.
 
 See Bosworth v. Whitley,
 
 627 So.2d 629, 633 (La.1993)(noting that “[i]n terms of due process, an application for commutation is ‘nothing more than an appeal for clemency,’ and a felon’s expectation that his law
 
 *872
 
 ful sentence will be commuted is ‘simply a unilateral hope.’ ”) This process was also available to the petitioner in
 
 Graham,
 
 yet the Supreme Court necessarily concluded it fell short of providing a “meaningful” or | ¶/‘realistic” opportunity to be released.
 
 See Bonilla v. State,
 
 791 N.W.2d 697, 700, n. 2 (Iowa 2010)(noting that “[a]lthough Bonilla could theoretically receive a commutation from Iowa’s governor, the Supreme Court of the United States rejected the ‘remote possibility’ of executive clemency in the cruel and unusual punishment analysis of
 
 Graham.”)
 

 Contrary to the State’s contention, we find that the
 
 Graham
 
 case applies to Mr. Richards’ sentence. He was convicted of aggravated rape, a non-homicide offense, and sentenced to life in prison without parole. Mr. Richards’ life sentence without parole violates the categorical rule enunciated by the Supreme Court in
 
 Graham.
 

 The appropriate remedy to satisfy the mandate of the
 
 Graham
 
 case was recently addressed by the Louisiana Supreme Court in
 
 State v. Shaffer,
 
 11-1756, 11-1757, 11-1758 (La.11/23/11), 77 So.3d 939. In
 
 Shaffer,
 
 the Court granted the consolidated writ applications of three relators who were sentenced to life imprisonment at hard labor following their convictions for aggravated rape when they were all juveniles. The sentence of one of the rela-tors, Michael Dyer, expressly precluded parole eligibility; the sentences of the other two relators did not. The Court found that the sentences of all three relators violated the mandate of the
 
 Graham
 
 case. The Court reasoned that “the Eighth Amendment precludes the state from interposing the Governor’s ad hoc exercise of executive clemency as a gateway to accessing procedures the state has established for ameliorating long terms of imprisonment as part of the rehabilitative process to which inmates [^serving life terms for non-homicide crimes committed when they were under the age of 18 years would otherwise have access, once they reach the age of 45 years and have served 20 years of their sentences in actual custody.”
 
 Shaffer,
 
 11-1756, 11-1757, 11-1758 at p. 3, 77 So.3d at 942. Continuing, the Court reasoned that “[t]he state thus may not enforce the commutation provisos in La. R.S. 15:574.4(A)(2) and 15:574.4(B) against relators and all other similarly situated persons.”
 
 Shaffer,
 
 11-1756, 11-1757, 11-1758 at pp. 3-1, 77 So.3d at 942. The Court held that the appropriate remedy to satisfy the mandate of
 
 Graham
 
 was as follows:
 

 We therefore amend the sentence of relator Dyer to delete the restriction on parole eligibility. The Department of Corrections is directed to revise relator Dyer’s prison master to reflect that his sentence is no longer without benefit of parole. Further, the Department is directed to revise relators’ prison masters according to the criteria in La. R.S. 15:574.4(A)(2) to reflect an eligibility date for consideration by the Board of Parole.
 

 Shaffer,
 
 11-1756, 11-1757, 11-1758 at p. 4, 77 So.3d at 943. The Court noted that “[t]he determination of whether relators may be released on parole falls within the exclusive purview of the Board of Parole, charged with the duty of ordering parole ‘only for the best interest of society, not as an award of clemency.’ ”
 
 Id.
 
 (citing La. R.S. 15:574.4.1(B)). The Court further noted that providing access to the Board of Parole’s consideration would satisfy the mandate of the
 
 Graham
 
 case.
 
 Id.
 

 Following the holding in
 
 Shaffer,
 
 we likewise amend Mr. Richards’ sentence to delete the restriction on parole eligibility and to provide instructions regarding access to the Board of Parole’s consideration.
 

 
 *873
 
 h
 
 (¡DECREE
 

 For the forgoing reasons, the defendant’s conviction is affirmed, and his sentence is amended to delete the restriction on parole eligibility. The Department of Corrections is directed to revise the defendant’s prison master to reflect that his sentence is no longer without benefit of parole. Further, the Department of Corrections is directed to revise defendant’s prison master according to the criteria in La. R.S. 15:574.4(A)(2) to reflect an eligibility date for consideration by the Board of Parole.
 

 CONVICTION AFFIRMED; SENTENCE AMENDED WITH INSTRUCTIONS.
 

 [1]
 

 . For privacy reasons, the initials of the victim and her immediate family are used in this opinion.
 

 [2]
 

 . Louisiana Code of Evidence Article 412.2 provides:
 

 A.When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused’s commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
 

 B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.
 

 C. This Article shall not be construed to limit the admission or consideration of evidence under any other rule.
 

 [3]
 

 . To protect the victim’s privacy, her initials are used in this opinion.
 

 [4]
 

 . The Supreme Court in
 
 Graham
 
 did not specify how the states should adjust the sentences of juveniles previously sentenced to life in prison without parole for a non-homicide crime. Instead, the Supreme Court held:
 

 It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment forbids a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require a State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted on nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society.
 

 Graham,
 
 560 U.S. at-, 130 S.Ct. at 2030, 176 L.Ed.2d at-.