Judge Regina Bartholomew-Woods
Appellant-Defendant, Clarence Gabriel, appeals the January 25, 2017 judgment of the district court finding him guilty of possession of a firearm by a felon, in violation of La.R.S. 14:95.1. Defendant was sentenced on October 4, 2017 to ten (10) years' imprisonment, at hard labor without the benefit of probation, parole, or suspension of sentence. For the reasons that follow, we affirm.
FACTUAL BACKGROUND
On May 24, 2016, Orleans Parish Sheriff--Captain Bryan Peters ("Captain Peters), working with the United States Marshal's Service on the Fugitive Task Force was assigned to locate Kelvin Dailey, the subject of an active arrest warrant. Captain Peters proceeded to the residence of Mr. Dailey's brother, Defendant Clarence Gabriel, ("Defendant") in an effort to elicit information concerning Mr. Dailey's whereabouts. Two other officers, Sergeant Tao and Deputy U.S. Marshal Brian Fair, knocked on Defendant's door while Captain Peters and another Deputy U.S. Marshal, Jerry Dyzart, remained in a patrol car to provide coverage.
Although Captain Peters could not see the person who answered Defendant's door, he later learned it was Mr. Dailey, the fugitive for whom they were searching. As Officers Peters and Dyzart approached the front door, they observed Defendant and his wife approaching the front door from inside the residence. Captain Peters testified that they seemed "agitated" at the police presence and "wanted to know what was going on." He further testified they ordered Defendant and his wife to sit on the couch in the front room while he and Deputy Fair conducted a protective sweep of the residence to ensure no safety threats were present "while they were dealing with Mr. Dailey."
The officers entered the first door they encountered off the living room and discovered a little girl lying on a mattress on the *348 floor watching television. Captain Peters observed "another full-size bed" against the wall in that room and a holstered, fully loaded, semi-automatic firearm was located on the bed, next to a set of dentures, a pair of scissors, and a cigarette lighter. Photographs taken at the scene also showed cotton swabs, what appeared to be a can of seasoning, and a pack of cigars among the items located on the bed near the firearm. Captain Peters escorted the child into the living room while Deputy Fair secured the firearm. According to the NCIC database, the weapon had not been reported stolen; however, a background check revealed that Defendant had previous felony convictions and was on active probation for burglary. Despite the insistence by the wife of Defendant that the gun belonged to her, Captain Peters and Deputy Dyzart took Defendant into custody for illegal possession of a firearm by a felon. As they were leaving, Captain Peters learned that the dentures discovered next to the firearm on the bed belonged to Defendant when he asked the officers "if he could have his teeth when he went to jail."
At Defendant's trial, on cross-examination, Captain Peters clarified that when he and the other officers approached Defendant's residence, Defendant was neither a fugitive, nor the subject of their investigation. He also testified that once they learned that the person who answered the door, Mr. Dailey, was the person for whom they were searching, they brought Mr. Dailey outside, placed him in handcuffs, and sat him in a folding chair on the front porch. He admitted that neither Defendant nor his wife was threatening or uncooperative at any time, nor did he witness either of them exiting or occupying any room other than the living room. According to Captain Peters, Defendant's wife, who had no outstanding warrants or felony convictions, claimed ownership of the gun and stated that she lived at that residence with her husband, and had done so for the preceding two (2) years. Captain Peters also admitted that he never asked Defendant if the gun was his, and he did not perform any gunshot residue or fingerprint testing at any time.
U.S. Marshal Inspector Fair testified that he investigated sex offenders in violation of registration requirements and was in pursuit of Mr. Dailey when he and other officers approached Defendant's residence to interview him regarding his brother's whereabouts. When Mr. Dailey answered the door, Deputy Fair testified that they "had him step outside" and "secured him," and then at that point, they noticed "several other people in the house that were just agitated and asking questions." The officers asked them to sit on the couch in the living room and then went inside to conduct a protective sweep of the residence. Deputy Fair testified that he entered the first open door off of the living room and "observed an eleven-year-old girl on the floor sleeping on a mattress," and a holstered firearm located on the side of a bed.
On cross-examination, Deputy Fair stated that Mr. Dailey was apprehended at the front door and that it was his decision to conduct the protective sweep because Mr. Dailey, who was handcuffed at the time, had become "agitated," and Defendant and his wife also appeared "agitated" and were "starting to ask questions," so he and two other officers entered the house to conduct the sweep. When asked if it was standard practice to conduct a protective sweep, Deputy Fair responded, "Just the area immediately to where we arrested somebody, which was right on the other side of that door." Deputy Fair also admitted that when he asked who owned the firearm, Defendant's wife responded that it belonged to her, despite its location on Defendant's "side of the bed," and near Defendant's dentures.
*349 In Defendant's case-in-chief, Gaynell Gabriel, Defendant's wife of twenty-two (22) years, testified that she and Defendant had been separated for over a year, and were separated and living separate and apart at the time of Defendant's arrest. Ms. Gabriel stated that she remembered the day of May 24, 2016, because she had taken her granddaughter, who resided at Defendant's home, to get an MRI. Her granddaughter had been anesthetized for the procedure, so when they returned to Defendant's home, Ms. Gabriel brought her into the bedroom. Ms. Gabriel recalled saying hello when she entered Defendant's home, but had observed Defendant napping in the living room so she proceeded into the bedroom with her granddaughter. She felt tired and decided to rest for a while, so she removed her weapon from her side and set it on the bed.
Approximately thirty (30) minutes later, she heard the front door open. The police entered the residence and "snatched the brother out the door," and then they told her to exit the bedroom and sit on the sofa in the living room. She testified that as the police were entering the bedroom, she informed them that her firearm was lying on the bed and that she did not reside in the home. Mrs. Gabriel stated that the police began interrogating her about the weapon and her brother-in-law. She responded that the gun was hers and that neither she nor her brother-in-law lived at the home; the only residents were Defendant and her granddaughter. Ms. Gabriel testified that she "kept telling them that it was [her] gun and [the officer] just kept telling [her] to shut up or [she] was going to jail."
Ms. Gabriel explained at trial that she always knocked on the front door when visiting Defendant's home, but if the door was unlocked and her granddaughter was with her, she would "go on in." She testified that on that day, when she entered Defendant's residence, the gun was holstered on her right hip, but she had not informed Defendant that she possessed the weapon. She also denied telling the officers that the gun had been located on Defendant's "side of the bed" because she did not live there and would not have known where in the bed he slept.
Ms. Gabriel testified that she had purchased the gun for herself from a pawn shop "across the river," but could not remember when or for what price. She thought she had received a receipt when she paid the deposit, but she was put on a waiting list and did not receive "the paperwork" until she actually took possession of the gun. She stated that she knew Defendant was on probation and could not possess firearms, but that Defendant's probation officer was aware that she owned a gun, and had simply warned her that Defendant could not touch it.
On cross-examination, Ms. Gabriel admitted that she owned the house in which Defendant resided, and that she had also resided there until their separation. She had subsequently moved in with her sister, then with a friend, and then with her son. She stated that she carried the firearm for her own protection and that she owned more than one. She also confirmed that Defendant was napping on the sofa in the living room when she entered the residence, and she had not noticed any other items on Defendant's bed when she removed her gun to lie down.
Defendant testified at trial that his granddaughter resided with him because she had a brain tumor and he cared for her. On May 24, 2016, he came home from work and was resting in his bed. Shortly thereafter, his brother knocked at the door looking for "somewhere to stay," but Defendant had refused because he did not have room. Defendant also explained that Mr. Dailey had recently been released *350 from prison, and he assumed his brother was on parole or probation, and did not want to risk violating his own probation terms. Defendant said he fell asleep as the two men were talking on the sofa in the living room. Defendant assumed he had been asleep for nearly two (2) hours and had not known that his wife and granddaughter had returned from the hospital, but he awoke when the police arrived and "snatched [his] brother out the door."
Defendant stated he started asking questions of the police, but was told to "sit down and be quiet." The police explained that they were arresting his brother and they asked for consent to search Defendant's residence, which he provided, stating that he had nothing to hide. He stated that he realized his wife was in the house when she exited his bedroom, and that she attempted to explain to the officers that the gun they discovered belonged to her and that Defendant knew nothing about it. According to Defendant, the police asked if he was on probation or parole, but never asked if he owned the weapon. Defendant explained that he had abided by the terms of his probation without fail for two-and-a-half years; he did not own or possess any firearms; he did not use drugs; he attended his probation appointments and paid his fines on time; and he avoided trouble.
Defendant testified that he was aware that his wife carried a gun for protection, but he had not known that she was inside his house when the police arrived and asked to search his home. He also did not know that his brother was a sex offender, and explained that, had he known, he would not have allowed his brother inside his home near his granddaughter. Defendant testified that he had removed his dentures and laid them on the edge of the bed when he arrived home from work, but because he slept in the middle of the bed, he did not agree that the dentures were located on his "side" of the bed. Defendant testified that he had no idea where the gun had been located in proximity to his dentures until he saw the pictures the police had taken. Nevertheless, once the police conducted a background check and confirmed that Defendant was on probation, they arrested him.
On cross-examination, Defendant admitted that he had pled guilty to a charge of felon in possession of a firearm in 1995, and had additional felony convictions since then. Defendant also admitted ownership of the several other items shown on his bed near his dentures in the police photographs, with the exception of the firearm. Defendant confirmed that he told his brother he was not welcome to stay there, even for the night. When asked why the police discovered Mr. Dailey's "stuff" inside Defendant's home, Defendant replied that his brother had brought "his stuff" with him when he arrived at Defendant's house.
On redirect examination, Defendant testified that he had no intention of violating his probation and had no intention of being near a firearm. He stated that he had always intended to comply with the terms of his probation, and indeed had complied with the terms of his probation, because he took care of his granddaughter, who had a brain tumor, and provided support for his wife, who was also very ill. He believed he would lose them both if he was incarcerated for violating his probation.
ERRORS PATENT
A review of the record reveals no errors patent.
ANALYSIS
Assignment of Error Number 1
In Appellant's first assignment of error, he argues the evidence is insufficient to support the conviction. We address this *351 assignment of error first, as it is controlling. In assessing sufficiency of the evidence, we are guided by the standard set forth in Jackson v. Virginia , 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979), which stated that:
[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Woodby v. INS, 385 U.S. 276, 282, 87 S.Ct. at 486, 17 L.Ed.2d 362 (1966) (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Johnson v. Louisiana, 406 U.S. 356, 362, 92 S.Ct. 1620, 1624-1625, 32 L.Ed.2d 152 (1972). This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.
(footnotes omitted).
"It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence." State v. Richards , 2011-0349, p. 9 (La.App. 4 Cir. 12/1/11), 78 So.3d 864, 869. "The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." Id. "Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness' testimony, if believed by the fact finder, is sufficient to support a factual conclusion." State v. Rapp , 2014-0633, pp. 6-7 (La.App. 4 Cir. 2/18/15), 161 So.3d 103, 108 (citing State v. Marshall , 2004-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369 ).
Furthermore, proof of guilt in this case was circumstantial. "Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts." State v. Carter , 1999-2234, p. 31 (La.App. 4 Cir. 1/24/01), 779 So.2d 125, 144. "When circumstantial evidence forms the basis of a conviction ... such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." Id.
Defendant in this case was convicted of violating La. R.S 14:95.1, relative to possession of a firearm by a convicted felon. La. R.S. 14:95.1 states, in pertinent part, that "[i]t shall be unlawful for any person who has been convicted [of an enumerated felony] to possess a firearm." In order to convict for possession of a firearm by a convicted felon, the State must prove beyond a reasonable doubt that Defendant: (1) possessed a firearm; (2) was previously convicted of an enumerated felony; (3) possessed the firearm within ten years of the previous conviction; (4) had the general intent to commit the crime.
*352 State v. Fields , 2012-0674, p. 6 (La.App. 4 Cir. 6/19/13), 120 So.3d 309, 315.
In this case, Defendant does not dispute that he was legally prohibited from possessing a firearm at the time of his arrest due to prior enumerated felony convictions. He argues, however, that the state failed to present sufficient evidence that Defendant possessed, or intended to possess the firearm, in light of his and Mrs. Gabriel's uncontradicted testimony that Mrs. Gabriel was the sole owner and possessor of the firearm, and that Defendant was unaware, at the time, that the weapon was in his home.
Actual possession of the firearm is not necessary to prove the possession element of La. R.S. 14:95.1 ; constructive possession is sufficient. Fields , 2012-0674, p. 6, 120 So.3d at 315. A person is in constructive possession of a firearm if it is subject to his dominion and control, even if it is only temporary and even if the control is shared. State v. Johnson , 2003-1228, p. 5 (La. 4/14/04), 870 So.2d 995, 998-99. "[M]ere presence of a defendant in the area of the contraband or other evidence seized alone does not prove that he exercised dominion and control over the evidence and therefore had it in his constructive possession. Id. , 2003-1228, p. 6, 870 So.2d at 999. Thus, the State must prove that the offender "exercised" dominion and control over the firearm. "When the perpetrator has not carried the firearm on his person, the State must show that the defendant's intent amounted to an intent to possess rather than a mere acquiescence to the fact that there was a firearm in his presence." State v. Haddad , 1999-1272, p. 2, n. 2 (La. 2/29/00), 767 So.2d 682, 684.
"General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." La. R.S. 14:10(2). "Guilty knowledge may be inferred from the circumstances and proved by direct or circumstantial evidence." State v. Clements , 2012-1132, p. 7 (La.App. 4 Cir. 3/13/13), 112 So.3d 306, 311. "Whether the proof is sufficient to establish possession turns on the facts of each case." State v. Thomas , 2014-0510 (La.App. 4 Cir. 5/20/15), 171 So.3d 959, 966.
In the instant case, during its closing argument, the State asserted that the police officers' testimony that they discovered the firearm in Defendant's bedroom, on his bed, and in the vicinity of other items he admitted to owning, including his dentures, was sufficient to meet its burden of proving beyond a reasonable doubt that the firearm belonged to Defendant. The State also asserted that even if Mrs. Gabriel, in fact, owned the gun, its location on Defendant's bed and among his belongings was sufficient to prove that Defendant intended to exercise dominion and control over the firearm, and did, in fact, exercise dominion and control there over.
In the instant case, neither police officer observed Defendant occupy or exit the bedroom in which the weapon was discovered. They also did not observe Mrs. Gabriel occupy or exit the bedroom. The State argued to the jury that it "doesn't make sense" that Mrs. Gabriel would enter Defendant's residence and remove her firearm before napping in Defendant's bed, although it appears that Defendant was aware that his granddaughter had a medical appointment and that his wife planned to escort her to the hospital and back. Defendant contends that proof of the proximity of the firearm to Defendant's other belongings is too attenuated to sustain the conviction for possession, arguing that the *353 police had conducted neither fingerprint nor gunshot residue analysis, on either the weapon, or Defendant or his wife, and the State presented no evidence that Defendant purchased, owned, physically possessed, or touched the firearm at any time, nor that he intended to.
In State v. Allen , 2012-0412, pp. 3-4 (La. 10/26/12), 101 So.3d 41, 43-44, the Supreme Court reinstated the defendant's conviction for possession of a firearm by a felon, finding the evidence sufficient to sustain the jury's verdict that Defendant was in constructive possession of a firearm discovered inside the vehicle he was driving, notwithstanding his girlfriend's testimony that she concealed the weapon in a hidden vault beneath the backseat without the Defendant's knowledge. However, the officer conducting the traffic stop had also observed the defendant reach behind him into the backseat. A drug-sniffing dog also indicated the presence of cocaine, attributed to the defendant, on the latch of the hidden vault.
In Clements , 2012-1132, p. 7, 112 So.3d at 311-12, this Court found that the defendant was in constructive possession of firearms based on the arresting officers' testimony that the defendant "was the sole occupant of the bathroom where the firearms were found in plain view in the open toilet tank." Further, the defendant's "actions-flushing the toilet, moving away from the area from which the firearms were immediately recovered, and his nervousness-demonstrated his awareness of the presence of the firearms and his general criminal intent to possess [them]." Id.
In Fields , 2012-0674, pp. 7-8, 120 So.3d at 316, the defendant was also found to be in constructive possession of a firearm when an officer testified that he discovered the weapon "sticking out between the mattress and box spring in [the defendant's] bedroom;" the defendant "acknowledged that he knew of the presence of the weapon in the residence" and "men's clothing, including Mr. Fields' shoes, were found in the bedroom" which appeared "co-habited by a man and a woman."
In State v. Mickel , 2009-953 (La.App. 5 Cir. 5/11/10), 41 So.3d 532, the Court held that a rational trier of fact could have found beyond a reasonable doubt that the defendant exercised constructive possession of the gun and that he intended to possess it because it was found underneath the bed he shared with his girlfriend, and that the jury could have reasonably inferred that Defendant was living in the residence and knew a gun was in a shoebox underneath the bed in which he slept.
On the other hand, this Court reversed the defendant's conviction in State v. Scott , 2015-0321, pp. 10-14 (La.App. 4 Cir. 2/26/14), 136 So.3d 383, 389-92, finding that the state did not prove the defendant possessed the firearm discovered in the home he shared with his girlfriend, despite his knowledge of its presence, because the gun was discovered in his girlfriend's purse, which had been hanging in a closet in a separate bedroom the defendant did not appear to have occupied.
Additionally, this Court held that a rational juror could not have found beyond a reasonable doubt that the defendant in State v. Smith , 1998-0366, p. 8 (La.App. 4 Cir. 5/12/99), 744 So.2d 73, 77, had constructive possession of a firearm discovered under his seat in the vehicle he was driving, which was discovered only after a search conducted by a K-9 unit. The vehicle belonged to the defendant's mother, who testified that she had never seen the gun before, but had allowed several other people to use the vehicle, and the defendant was not in possession of any ammunition. Id.
*354 In the instant case, the State's evidence proving Defendant intentionally possessed the firearm was its location on Defendant's bed near his dentures and other personal belongings of Defendant. Both of the State's witnesses testified that Mrs. Gabriel told them that she lived in the residence with Defendant, but Mrs. Gabriel testified that she had not resided there for at least a year despite her ownership interest in the property. Both Defendant and his wife testified that she was the sole occupant of the bedroom when the police entered the residence, however, both officers testified that Defendant and his wife were in the living room and the child was the only occupant of the bedroom when they entered; neither the other two officers nor Defendant's brother or granddaughter, all of whom were present at the time, testified at the trial. Defendant argues that the State did not disprove his hypothesis of innocence, however, when "a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis falls; and, unless another one creates reasonable doubt, the defendant is guilty." State v. Beaulieu , 2012-0735, p. 13 (La.App. 4 Cir. 8/7/13), 122 So.3d 1050, 1059 (citing State v. Captville, 448 So.2d 676 (La. 1984) ). Although the State's evidence was entirely circumstantial and not overwhelming, Defendant does not show that the jury acted irrationally when it rejected his and Mrs. Gabriel's testimony that Defendant was unaware of the presence of either his wife or the firearm in his home, and the jurisprudence interpreting La. R.S. 14:95.1 is not irreconcilable with the jury's finding in this case. Accordingly, we find the evidence was sufficient to support Defendant's conviction.
Assignment of Error Number 2
Defendant argues that the warrantless, protective sweep that the officers conducted after they arrested Mr. Dailey in the front door of Defendant's residence, which resulted in the discovery and seizure of the handgun in Defendant's bedroom, was unconstitutional and the evidence, therefore, should have been suppressed.
"[W]arrantless searches of a home are impermissible absent consent or exigent circumstances." Steagald v. United States , 451 U.S. 204, 216, 101 S.Ct. 1642, 1650, 68 L.Ed.2d 38 (1981). See also State v. Howard , 2015-1404, p. 7 (La. 5/3/17), 226 So.3d 419, 424 ("A search warrant must be obtained, absent exigent circumstances or consent, to enter the house of a third party to search for the subject of an arrest warrant."). In this case, Defendant testified at trial that he gave the officer consent to search his home. The colloquy proceeded as follows:
DEFENSE COUNSEL: So what happened after the police snatched your brother out of the door?
DEFENDANT: I jumped up, asked them what's going on. He told me, "Man, just sit down and be quiet. We got what we want, but we want to do some kind of search." I said, "go ahead. I have nothing to hide."
DEFENSE COUNSEL: So you gave them consent to search?
DEFENDANT: Yes, Ma'am.
Defendant admitted that he consented to the warrantless entry and subsequent search of his home. Accordingly, the officer's actions that resulted in the discovery of the handgun in his bedroom complied with the constitutional requirements for a warrantless search, and the evidence was therefore properly admitted at trial.
CONCLUSION
For the foregoing reasons, Defendant's conviction is affirmed.
AFFIRMED
BELSOME, J., DISSENTS WITH REASON.
LOBRANO, J., CONCURS IN THE RESULT.
BELSOME, J., DISSENTS WITH REASON.
*355 I respectfully dissent from the majority opinion. In particular, I do not find that the evidence was sufficient to establish that the Defendant was guilty beyond a reasonable doubt of possessing a firearm while being a convicted felon. The well settled standard of review for a sufficiency of the evidence claim is whether any rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Williams , 11-0414, p. 15 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 769. On appeal, a reviewing court must consider the record as a whole as that is what a rational trier of fact would do. State v. Santinac , 99-0782, p. 6 (La. App. 4 Cir. 6/14/00), 765 So.2d 1133, 1137. While rational decisions to convict must be upheld, irrational decisions to convict should be reversed. State v. Mussall , 523 So.2d 1305, 1310 (La. 1988). "If the court finds that no rational trier of fact viewing all of the evidence from a rational pro-prosecution standpoint could have found guilt beyond a reasonable doubt, the conviction cannot stand constitutionally." Id. at 1311.
Where a conviction was based on circumstantial evidence, the evidence "must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. This test is not separate from the Jackson standard; rather, it simply requires that "all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt." State v. Ortiz , 96-1609, p. 12 (La. 10/21/97), 701 So.2d 922, 930. A reviewing court is not to determine whether a potential hypothesis suggested by the defendant could present an exculpatory explanation of the events. State v. Davis , 637 So.2d 1012, 1020 (La. 1994). Instead, the reviewing court determines whether the defendant's hypothesis is "sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson . " Id. ; State v. Calloway , 07-2306, p. 10 (La. 1/21/09), 1 So.3d 417, 422.
This is a constructive possession case, thus the evidence presented was circumstantial and of a speculative nature. Unless that evidence excluded every reasonably hypothesis of innocence, Defendant's conviction cannot stand. See State v. Gould , 395 So.2d 647, 656 (La. 1980). While the State was able to demonstrate that the firearm was located on his bed, near some of his personal items, it was not able to rebut the fact that the firearm was registered to his wife, Gaynell Gabriel, who testified that she removed the firearm from her person while taking a nap with her sick granddaughter on the Defendant's bed.
Given the foregoing, a rational juror, viewing the evidence in the light most favorable to the prosecution, could only have speculated as to who possessed the firearm. Accordingly, since the evidence cannot exclude every reasonable hypothesis of innocence, the Defendant's conviction cannot stand. Accordingly, I dissent from the majority and would reverse the Defendant's conviction.