STATE OF LOUISIANA

VERSUS

DARTANYA O. SPOTTSVILLE AKA "LO"

NO. 24-KA-26

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 15-3758, DIVISION "J"
HONORABLE STEPHEN C. GREFER, JUDGE PRESIDING

October 30, 2024

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and Timothy S. Marcel

**CONVICTIONS AFFIRMED; SENTENCES AFFIRMED AS TO
COUNTS 1, 2 AND 4; REMANDED FOR CORRECTION OF UCO
AND MINUTE ENTRY OF SENTENCING AS TO COUNT 3**
 **FHW**
 **SMC**
 **TSM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/APPELLANT,
DARTANYA SPOTTSVILLE A/K/A LO
    Gwendolyn K. Brown


COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Paul D. Connick, Jr.
    Thomas J. Butler
    Matthew R. Clauss

**WICKER, J.**

Defendant-Appellant, Dartanya O. Spottsville a/k/a "Lo," ("Spottsville"), appeals his convictions of two counts of second degree murder (La. R.S. 14:30.1), one count of attempted second degree murder (La. R.S. 14:27 and 14:30.1) and one count of possession of a firearm by a convicted felon (La. R.S. 14:95.1), on grounds that the trial court erred in admitting at trial evidence relating to the mapping of his cell phone records, which was presented through the testimony of a detective who had not been qualified by the State as an expert witness in cell phone triangulation.

For the reasons stated below, we affirm, but on errors patent review, we find that the sentence imposed by the trial court as to Count 3 is illegal, in that it was not imposed without benefits of probation, parole or suspension of sentence, and, therefore, remand the case for correction of the UCO and the Minute Entry of sentencing.

**STATEMENT OF THE CASE**

On September 24, 2015, the Jefferson Parish Grand Jury returned a four-count indictment charging Spottsville with two counts of second degree murder in connection with the deaths of Johnell Ovide a/k/a "Ruga" (Count 1) and Trammel Marshall a/k/a "Mel" (Count 2), in violation of La. R.S. 14:30.1. He was also charged with the attempted second degree murder of Blake Lamb ("Lamb"), in violation of La. R.S. 14:27 and 14:30.1 (Count 3), and with being a felon in possession of a firearm, in violation of La. R.S. 14:95.1 (Count 4).[1] Spottsville pled not guilty to all counts. A superseding indictment was filed on October 8, 2015, charging Spottsville with the same four offenses; he again pled not guilty to all counts.[2]

---

[1] The parties stipulated at trial that Spottsville had a prior conviction for possession of heroin (24th JDC No. 13-5611), in violation of La R.S. 40:966(C).

[2] The superseding indictment also named Jacobie A. Green a/k/a "Cobie" ("Green") and Johnell Walker a/k/a "Shadow" ("Walker") as defendants in the first three counts and added an additional count charging

The case proceeded to trial on September 16, 2019 (the "First Trial") and, on September 20, 2019, Spottsville was convicted, in non-unanimous verdicts, on all counts.[3] Spottsville filed a Motion for New Trial asserting the unconstitutionality of the non-unanimous jury verdicts. His motion was denied on November 19, 2019, whereupon, he was sentenced to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence on each of Counts 1 and 2, to run consecutively; 50 years at hard labor on Count 3, to run consecutively with the sentences on Counts 1 and 2; and 10 years at hard labor, without benefit of parole probation or suspension of sentence on Count 4, to run concurrently with the sentences imposed on Counts 1, 2 and 3. Spottsville appealed his convictions and sentences to this Court (the "First Appeal").

The sole issue raised by Spottsville in his First Appeal was that, under *Ramos v. Louisiana,* 590 U.S. 83, 140 S.C. 1390 (2020),[4] the verdicts were required to be unanimous; thus, the non-unanimous verdicts in his case were unconstitutional. Based on *Ramos,* this Court vacated Spottsville's convictions and sentences and remanded the case for a new trial.[5]

Spottsville's retrial on the same charges commenced on September 6, 2023. On September 7, 2023, Spottsville was found guilty by a unanimous jury on all counts. He then filed a Motion for New Trial, which was denied by the district court on October 11, 2023, whereupon, the district court again sentenced Spottsville to life imprisonment at hard labor without benefit of parole probation or suspension of

---

Archie Hulbert, III with perjury before the Grand Jury considering the case, a violation of La. R.S. 14:123.

[3] The verdict on Count 1 was 10 to 2, and the verdicts on Counts 2 through 4 were 11 to 1.

[4] *Ramos* held that Louisiana's system of allowing a person to be convicted of a serious crime and deprived of his liberty by a non-unanimous jury verdict violates the Sixth Amendment to the U.S. Constitution, applicable to the States through the Fourteenth Amendment. The Court further held that its decision applied to all cases then on direct appeal where a defendant was convicted by a non-unanimous jury and the defendant had preserved the issue in the trial court. Here, Spottsville preserved the issue for appeal by the filing of a pre-trial a *Motion to Quash and to Declare Article 782(A) Unconstitutional Because it Allows for a Non-Unanimous Verdict Herein,* which the trial court denied on September 11, 2019, and a *Motion for New Trial,* as discussed above.

[5] *State v. Spottsville,* 20-99 (5 Cir. 12/23/20), 308 So.3d 1240 ("*Spottsville I*").

sentence as to each of Counts 1 and 2; 50 years at hard labor on Count 3, all three sentences to run consecutively; and 10 years at hard labor without benefit of parole, probation or suspension of sentence on Count 4, to run concurrently with the sentences on the first 3 counts. Spottsville timely filed a Motion for Appeal, which was granted. This appeal follows.

**STATEMENT OF FACTS**

On June 21, 2015, Trammell Marshall a/k/a "Mel" ("Marshall") and Johnell Ovide a/k/a "Ruga," ("Ovide") were shot and killed while visiting their friend and relative, Reginald Henry ("Henry"). Lamb, a friend of Henry's, who was also visiting Henry at his apartment that evening, was shot multiple times, but survived. Spottsville, along with Green and Walker, was charged as set forth above in conjunction with these shootings.

In addition to the testimony of the detectives who investigated the incident, the evidence introduced at trial included the testimony of two eyewitnesses, Henry and Lamb.

**Henry's Testimony:**[6]

On the evening of June 21, 2015, Marshall, Ovide and Lamb were hanging out in the living room of Henry's apartment at 1617 Apache Drive in Harvey, Louisiana, smoking marijuana. Ovide and Lamb were armed with handguns at the time. Henry, an event promoter, had an event that night and was getting dressed to go out, but was moving in and out of the living room talking to his friends. At approximately 10 p.m., there was a knock on the door. Marshall opened the door to "Shadow" (Walker), whom he invited in, with Henry's consent. When "Shadow" came inside, "Lo" (Spottsville) and "Cobie" (Greene) also entered the apartment.

Walker came in and sat down beside Lamb. Green stood by the front door. Spottsville initially sat beside Marshall and/or Ovide before moving to sit opposite

---

[6] Henry was permitted to testify via Zoom, as he was positive for COVID at the time of the trial.

Lamb. Once Spottsville sat next to Lamb, he picked up Lamb's handgun from a stool that was located in front of Lamb. Henry was walking into the living room at that point and he and Lamb both told Spottsville to return the gun to Lamb because there was "one in the head," meaning that there was a live round in the chamber. Instead, according to Henry, Spottsville turned towards Ovide and pulled the trigger of Lamb's gun and then, turned and shot a second time, down towards Lamb, who was still seated on the sofa. Henry had not heard anyone threaten Spottsville before he opened fire, nor had he observed any struggle between Spottsville and Lamb for the gun.

As soon as the shots were fired, Henry ran into his bedroom, jumped out of the window and fled to a neighbor's house. As he was running away, he heard multiple gunshots being fired from different guns and people screaming, stating that it sounded like "World War" inside his apartment. Upon fleeing his apartment, Henry thinks that he called his cousin and asked her to call 911. He thinks he also called 911 when he was safely inside his neighbor's house. When deputies and EMTs arrived, Henry went back to the crime scene, where he observed Marshall in an ambulance and Lamb sitting in the doorway, shaking, with blood coming out of his mouth.

Henry, who was in a state of extreme emotional distress, was interviewed by detectives on the scene. Henry told detectives about what had transpired earlier, but was unable to remember the full names of the three men who had come into his apartment earlier that night and shot his friends. Later, at the Investigations Bureau (the "Bureau"), Henry told detectives that he knew where the men lived and they drove him to the location that he had identified—a duplex on Betty Street—where Henry believed that Spottsville lived on one side and Green on the other.[7] That same

---

[7] In subsequent testimony, it was also established that Detective Jean Lincoln and Detective William Roniger drove Henry by the location of 1477 Lincoln Street, which Henry had identified as the residence of Walker.

evening, the detectives showed Henry photo line-ups, from which he identified photographs of Spottsville, Green and Walker as the men who had come into his apartment and started shooting.[8] Henry testified that there was no doubt in his mind that Spottsville was the one who took Lamb's gun and fired it toward Ovide and Lamb on the night of June 21, 2015.

**Lamb's Testimony:**

Lamb testified that on June 21, 2015, he was at Henry's apartment, along with Marshall, Ovide and Henry, while Henry was getting dressed for an event that he was promoting later that evening. At about 10 p.m., there was a knock on Henry's door.[9] Marshall answered the door and admitted Walker, Green and Spottsville into the apartment. According to Lamb, everyone in Henry's apartment was armed with a handgun except Henry and Marshall.

Ovide was sitting with his gun on his lap and Spottsville asked to see the gun. Ovide handed the gun over to Spottsville, who looked at the gun and then gave it back to Ovide. Spottsville then asked to see Lamb's gun and Lamb handed it to him, alerting him that there was "one in the head." Upon being requested to return the gun to Lamb, Spottsville instead turned and shot Ovide. Lamb does not recall whether Spottsville then shot at him or not because Green and Walker also immediately began shooting. According to Lamb, Walker shot him multiple times.

Once the shooting started, Green, who was standing by the door, opened it and Spottsville ran from the apartment with Ovide chasing after him. Marshall jumped into the kitchen, followed by Green and Walker. Henry ran into his bedroom. Lamb, who was seriously injured, heard screaming and shots being fired in the kitchen. Lamb slid to the floor from the sofa that he was sitting on and, when Green and Walker exited the kitchen, they walked over to him. Green then shot him

---

[8] In fact, Spottsville did not live in the duplex, his sister did; however Walker did live on the other side of the duplex.

[9] This door was the only way into or out of Henry's apartment.

in the mouth and ran out the door with Walker. Marshall got up from the kitchen and walked out the front door. Lamb was able to walk into the bedroom to check for Henry, who had jumped out the window. Lamb then slid down the front door where he remained until he was transported to the hospital. The entire incident happened within a matter of seconds.

Lamb spoke briefly with detectives on the scene and was then transported to the hospital. He was shot in the hand, face, his left side, shoulder and forearm. He lost consciousness at the hospital and remained unconscious for a day or two. He spent two weeks in the hospital as a result of his injuries. Investigating detectives came to the hospital and showed him some photographs from which he identified "Shadow," "Lo" and "Cobie" (Walker, Spottsville and Green, respectively) as the individuals involved in the June 21, 2015 shooting inside Henry's apartment.

Lamb denied that there had been any conflict between him and Spottsville prior to Spottsville taking Lamb's gun and shooting at him and Ovide. He also denied that there was any struggle for the gun before Spottsville turned towards Ovide and pulled the trigger. The only people injured in this incident were the people who were already in the apartment, *i.e.,* Lamb, Marshall and Ovide. Lamb positively identified Spottsville in the courtroom as the individual who took his gun and shot it at Ovide.

### Testimony of the Investigating Officers[10]

The first officer to arrive at the scene was former Jefferson Parish Detective Christian Dabdoub. He testified that upon his arrival, he observed two victims lying on the ground outside the apartment building and another victim sitting in the doorway of Apartment H. Both victims found lying outside the apartment building, later identified as Marshall and Ovide, appeared to have suffered multiple gunshot

---

[10] The State also introduced the testimony of the coroner who performed the autopsies of Ovide and Marshall. That testimony is not relevant to the issues raised on appeal and is not discussed in this opinion.

wounds. One of them (Ovide) was unresponsive and apparently deceased. The other victim (Marshall) was alive, but seriously injured. The third victim who was sitting in the doorway, later identified as Lamb, had also been shot multiple times and was seriously wounded but alive. When asked by Detective Dabdoub who had shot them, both Marshall and Lamb replied that it was Cobie (Green).

Detective Dabdoub observed that a front-facing window in the apartment was broken, with the blinds and drapes pushed to the outside, causing him to believe that someone had gone through it. He also observed Henry's apartment in a complete state of chaos, with overturned furniture, shell casings and blood everywhere.

Henry, who had been hiding behind some vehicles parked near the apartment building, approached Detective Dabdoub when Marshall was being loaded into the ambulance. Henry was in extreme emotional distress, but was able to describe three individuals as being responsible for the shooting. He identified two of them by nicknames and provided physical descriptions and addresses of all three suspects. He also described a dark blue vehicle, in which the individuals had arrived and left the scene.

Former Jefferson Parish Sheriff's Deputy Kenneth Bonura was called to the scene and asked to secure Ovide's body and a firearm that was discovered next to the body. Deputy Bonura removed the gun from the ground, removed the magazine from the gun, checked the chamber, locked the slide and secured the weapon in the trunk of his vehicle. Deputy Bonura testified that the magazine was full, having eight live rounds, but the chamber was empty. The gun did not appear to have been fired.

After speaking to Detective Dabdoub at the scene, Henry was relocated to the Bureau where he was interviewed by Detective Jean Lincoln. She testified that she developed three suspects based on the information provided by Henry in the interview. Henry identified one of the suspects by his nickname and last name, and

one by nickname only. He was unable to name the third suspect, but stated that he knew the suspect and knew where he lived. Detective Lincoln prepared photographic line ups and showed them to Henry, from which he identified Walker and Green. Detectives Lincoln and Roniger then took Henry to the locations that he had identified, 1909 and 1911 Betty Street, which he indicated was the residence of Green and the third suspect, and 1477 Lincoln Street, which was the residence of Walker.

Detective Lincoln subsequently found that Spottsville was associated with 1911 Betty Street[11] and developed Spottsville as the third suspect. She then prepared a third line up from which Henry identified Spottsville as the third man who had been involved in the shootings.

Search warrants were prepared for the Betty Street addresses. No evidence was recovered from 1911 Betty Street (the address associated with Spottsville), but two empty firearm boxes and receipts showing that the handguns associated with those empty boxes had been purchased by Green were recovered from 1909 Betty Street (Green's address).[12] Also recovered from Green's address were a Glock .40 caliber magazine, .40 caliber ammunition, and two target-practice silhouettes.

Arrest warrants were prepared for Spottsville, Walker and Green. Spottsville and Green were arrested the following day. When interviewed by detectives after their arrests, neither Spottsville nor Green had any apparent injuries to his person. In his interview, Spottsville denied being at Henry's apartment the previous evening and stated that he was in the Little Woods area of New Orleans East at the time of the shootings.

In an attempt to confirm Spottsville's alibi, former Jefferson Parish Detective Gabriel Faucetta obtained a search warrant directed to Sprint Corporation ("Sprint")

---

[11] It was later discovered that Spottsville did not live at 1911 Betty Street at the time of the shootings, his sister did, although he had previously either lived there or had listed it as his address.
[12] Both guns were Glock .40 caliber models; one was a Model 23 and the other was for a Model 22.

for Spottsville's cell phone records and cell site activation information.[13]   The records showed calls made and received by Spottsville (and Green) on the evening in question, as well as the location of the cell towers activated by those calls.   The cell phone records were provided to Detective Donald Zanotelli for mapping. Defense counsel raised no objections to Detective Faucetta's testimony relative to the cell phone records.

Detective Zanotelli, whose testimony regarding Spottsville's cell phone records, and the demonstrative exhibits prepared by him from those records, is the subject of Spottsville's assignments of error in this appeal.  He testified as follows:

He was the officer in charge of the crime scene at the Apache Drive apartment on the evening of June 21, 2015.   Among other items recovered from Henry's apartment and the area surrounding the apartment that night were several fired .40 caliber Hornady and DRT casings and an unfired RP380 cartridge.   An unknown copper jacket from a fired bullet removed from Ovide's abdomen was found at the scene.   Additionally, an unknown caliber copper projectile was removed from Lamb's lower lip at the hospital and turned over to the detectives.   The morning following the shooting, detectives were notified that another .40 caliber DRT casing had been located at the scene.   That casing was retrieved and logged into evidence.

Once Henry had identified the three suspects, search warrants directed to Sprint were obtained for the cell phone records of Spottsville and Green.  The records provided by Sprint were reviewed by Detective Zanotelli and used to map Spottsville's and Green's incoming and outgoing calls, using the latitude and longitude of the tower locations through which the calls were processed.  The raw cell phone records received from Sprint[14] were introduced at trial with no objection by defense counsel.

---

[13] Detective Faucetta also served a search warrant on Sprint for Green's cell phone records.
[14] State's Exhibits 158 and 159.

Detective Zanotelli also prepared a PowerPoint presentation (State's Exhibit 160 in globo) depicting certain information contained in the cell phone records. Exhibit 160 included slides of the cell phone records of calls received and made by Spottsville and Green during the relevant time period on the night of the shootings (State's Exhibits 160A and 160B) and a "key" to the PowerPoint presentation (State's Exhibit 160C), which were introduced into evidence without objection. The PowerPoint presentation also included slides of maps created by Detective Zanotelli (the "Zanotelli Maps") by inputting the latitude and longitude coordinates of the towers contained in the cell phone records into a computer mapping program. The resulting maps depicted the locations of the towers to which the calls connected at times relevant to the shootings.

Defense counsel repeatedly objected to Detective Zanotelli's testimony regarding the cell phone records and to the introduction of printouts of the Zanotelli Maps on the ground that Detective Zanotelli was not qualified as an expert in cell phone triangulation and that the mapping of cell phone data requires scientific, technical, or other specialized knowledge, which Detective Zanotelli did not possess. Therefore, according to defense counsel, Detective Zanotelli's testimony was inadmissible under La. C.E. art. 702(A). Defense counsel cited *U.S. v. Medley,* 312 F.Supp. 3d 493 (D. Md. 2018) in support of her objections. The district court found that *Medley,* a Maryland federal court decision, had no precedential value in Louisiana state courts and ruled that Detective Zanotelli's testimony and evidence would be admitted over defense counsel's objections, stating:

> Okay. All right. So, what I'm going to rule is that I will allow the raw data plotted on the map, because I don't think that requires any particular expertise. So, to the extent that he plotted raw data on the map, and that map graphically depicts those longitude and latitude locations at specific times, which is all part of the raw data, as I appreciate it, then, I'm going to allow that.[15]

---

[15] Tr. September 6, 2023, p. 114.

Following the court's ruling, Detective Zanotelli testified about contents of the cell phone records relative to the towers to which Spottsville's and Green's cell phones connected at specific times on the night of June 21, 2015. Specifically, Spottsville's cell phone connected with a tower near the crime scene around the time the shooting occurred, and did not connect with any towers in or near New Orleans East until after the time of the shooting.

Former Jefferson Parish Detective William Roniger obtained and reviewed Spottsville's and Green's cell phone records and the Zanotelli Maps, and determined that Spottsville and Green did not get to Little Woods until after the shootings. He also observed that the last tower to which Spottsville's and Green's cell phones connected on the night of the shootings was located at Lincoln Beach on Lake Pontchartrain. Thinking that Spottsville and Green may have gone to that location to dispose of their weapons, Detective Roniger arranged for a search of the area, but no weapons were located. Defense counsel did not lodge any objection to Detective Roniger's testimony about the contents of the Zanotelli Maps or the location of Spottsville's cell phone at given times based on those maps.[16]

Dr. Timothy Scanlan, who was employed by the Jefferson Parish Sheriff's Office at the time of the shootings as the Laboratory Services Commander, second in command of the Technical Services Bureau and who personally participated in the analysis of the firearm evidence collected from all sources in conjunction with this case, was accepted by the court as an expert in the field of firearms and tool mark identification. He testified that eleven casings were removed from the crime

---

[16] Detective Daniel Lincoln, who testified as a lay witness, and Detective Solomon Burke, who was accepted by the Court as an expert in digital analysis of cell phones, both provided testimony regarding cell phones that were recovered during the course of the investigation. One of the phones was an Apple iPhone that had been recovered by Detective Lincoln from Green's residence and apparently belonged to Green. Detective Burke analyzed Green's phone and found a photograph of Green and Spottsville holding Glock handguns. He was unable to conduct any meaningful analysis of the other phones recovered from the scene or from the defendants that were provided to him. Neither the photo nor the specific Glock handguns depicted in the photo were directly linked by Detective Lincoln, Detective Burke or any other witness to the shootings of Ovide, Marshall and Lamb. No cell phone associated with Spottsville was recovered by Detective Lincoln or analyzed by Detective Burke. For these reasons, their testimony is not discussed in this opinion.

scene, with eight identified as being fired by one unrecovered firearm and three from another. The eight casings were consistent with being fired by a Glock firearm. It appeared that Ovide and Lamb were shot with a Glock, but Marshall was shot with a different gun.

The weapon that was found near Ovide's body and recovered by Deputy Bonura was identified by Dr. Scanlan as a Walther PDK simi-automatic weapon that fires .380 caliber cartridges. The gun has an eight-round magazine. A live cartridge recovered from inside Henry's apartment was the same caliber and brand as six of the rounds that were in the magazine when Deputy Bonura recovered the gun. The gun had not been fired and was non-functional when recovered because there was no round in the chamber.[17]

**Spottsville's Testimony:**

Spottsville testified in his own defense. His version of the events of the evening of June 21, 2015, significantly differed from the testimony provided by Henry and Lamb. He testified that on the evening of June 21, 2015, he went to Henry's apartment with Green and that Walker was already there when they arrived. After the three of them entered the apartment, Spottsville was on the sofa scrolling through his cell phone when he looked up and saw that Lamb had a gun pointed in his face. He told Lamb to get the gun out of his face, but Lamb just laughed. Spottsville then told Lamb a second time to get the gun out of his face. It appeared to Spottsville that Lamb was about to stand, so Spottsville jumped up from where he was seated. Spottsville testified that Lamb then dropped his phone and swung his left hand, in which Lamb was holding the gun, towards Spottsville. Spottsville tried to knock the gun out of Lamb's hand but the gun went off. Spottsville did not see

---

[17] It was speculated that Spottsville removed a live round from the chamber of Ovide's gun when he was handling it and dropped it on the floor of the apartment to render the gun non-functional. Dr. Scanlan testified that the finding of the unfired .380 caliber round on the floor of Henry's living room could be consistent with such a scenario.

in what direction the gun fired. The two men then struggled for the gun. Spottsville took the gun away from Lamb and shot at Lamb, who was coming toward him in an angry manner. Spottsville, who assumed that he hit Lamb, immediately dropped the gun inside the residence and ran out of the apartment to his vehicle to flee the scene.[18] As he was running to his car, he heard gunshots coming from inside the apartment.

Shortly after Spottsville got into his car, Green came out and also got into the car, and they then went to the house of a friend of Spottsville's in Little Woods. Spottsville testified that the actions that he took on the evening of June 21, 2015 were taken in self-defense and that he was terrified for his life.[19]

On cross-examination, Spottsville admitted that when he was arrested the next day, he – falsely – told the detectives who interviewed him that he was nowhere near Henry's apartment on the evening of June 21, 2015, but was at a friend's house in the Little Woods section of New Orleans East at the time of the shooting. He also testified on cross-examination that he had reviewed his cell phone records and that after he and Green left Henry's apartment following the shootings, his cell phone pinged all the way into New Orleans. He did not deny that his phone had pinged to a tower near Lake Pontchartrain later that night, but stated that he had not been there.

**Rebuttal by Dr. Scanlan:**

In rebuttal, Dr. Scanlan disputed Spottsville's claim of firing only one time, pointing out that three matching casings were found at the scene that did not match the Glock that Spottsville claimed was in Green's possession that night. Dr. Scanlan also testified that the ballistic evidence supported Henry's and Lamb's descriptions of Spottsville's position when he fired at Ovide and then at Lamb.

---

[18] Spottsville testified that Walker later told him that he (Walker) had picked up Lamb's gun after Spottsville fled the scene and had disposed of it.

[19] Spottsville contradicted his own testimony by testifying on cross-examination that he was not afraid of Lamb, but was just shocked at what was going on. He also testified that he did not fear Ovide, Marshall or Henry at the time.

## ASSIGNMENTS OF ERROR

Spottsville raises two assignments of error, both of which relate to the district court's admission of the testimony of Detective Zanotelli regarding the cell phone records. First, Spottsville asserts that "[b]ecause an insufficient foundation was laid for its admission, the trial court erred by overruling the defense objections to the testimony and evidence regarding the historical cell phone data." Second, Spottsville contends that "[t]he trial court erred by denying the motion for new trial predicated upon the trial court's erroneous admission of this evidence."[20]

## DISCUSSION

Expert witness testimony is governed by La. C.E. art. 702(A), which provides:

A. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

   (1) The expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
   (2) The testimony is based on sufficient facts or data;
   (3) The testimony is the product of reliable principles and methods; and
   (4) The expert has reliably applied the principles and methods to the facts of the case.

Spottsville contends, based on *State v. Saltzman,* 13-276 (La. App. 3 Cir. 12/4/2013), 128 So.3d 1060, that the type of testimony given by Detective Zanotelli in this case requires specialized knowledge, skill, experience, training or education and can only be given by an expert in cellular phone triangulation, Since Detective Zanotelli was not qualified as such under Article 702(A), Spottsville argues his testimony regarding the cell phone records was inadmissible. Spottsville claims that the admission of Detective Zanotelli's, testimony relative to the cell phone records prejudiced his case because he (Spottsville) testified at trial; thus, it was imperative

---

[20] To align with appellant's brief and because they are related, these assignments of error are discussed together.

that he establish his credibility and this erroneously admitted evidence was used to impeach his testimony.

In *Saltzman,* defendants, Carol Saltzman ("Saltzman") and Robyn Davis ("Davis"), were charged with and convicted of the second degree murder of Davis' husband. Both gave statements to investigating detectives regarding their whereabouts before, during, and immediately after the murder. During the investigation, one of the investigating detectives, Brent Young, reviewed Davis' and Saltzman's cell phone records of calls placed and received, compared them to the locations of the towers through which calls were routed, and discovered that the cell phone data did not support the statements provided by the two women.[21]

At trial, the State introduced the testimony of Detective Young, who testified, without objection, regarding his review of the defendants' cell phone records, and the discrepancies between them and the statements of the defendants. Detective Young was not qualified by the State as an expert in cell phone triangulation or geolocation, but testified as a lay witness.

The State also introduced testimony of Special Agent William Shute of the FBI, who was qualified by the trial court, after a *Daubert* hearing and over the defendants' objection, as an expert witness in historical cell site analysis.[22]

On appeal, Saltzman argued that the evidence was insufficient to sustain her conviction. According to Saltzman, the evidence used to convict her was completely circumstantial and she was convicted solely based on "unreliable historical cell site

---

[21] *Saltzman*, 128 So.2d at 1068-69, 1074-75; Detective Young also reviewed cell phone records of a witness and the victim's mistress and her husband and eliminated them as suspects based on their cell phone records. *Id*. at 1070, 1071.

[22] *Daubert v. Merrell Dow Pharmaceutical Company,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) set forth the test for determining the reliability of expert scientific testimony, which was extended to testimony based on technical and other specialized knowledge in *Kumho Tire Co., Ltd. V. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This test was adopted in Louisiana by *State v. Chauvin,* 02-1188 (La. 5/20/03), 845 So.2d 697. The *Daubert* factors are (1) the testability of the scientific theory or technique; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the methodology is generally accepted in the scientific community. See *State v. Edwards,* 97-1797 (La. 7/2/99), 750 So.2d 893, 909, *cert. denied,* 528 U.S. 1026, 120 S.Ct. 542 145 L.Ed.2d 421 (1999).

analysis [and on] some inconsistent statements regarding where she had been at particular times during the day preceding the disappearance of Mr. Davis and on the afternoon he went missing."[23]  She contended that the trial court should not have accepted Agent Shute as an expert in cell site analysis and should not have  admitted his testimony regarding his analysis of the defendants' cell phone records, arguing that "Agent Shute's methodologies are investigative techniques, not science."[24]  Here, Spottsville argues the opposite – *i.e.,* that Detective Zanotelli's methodologies are science, not investigative techniques. Agent Shute's testimony at the *Daubert* hearing in *Saltzman* refutes both arguments.

At the *Daubert* hearing, Agent Shute testified that "[t]o perform a historical cell site analysis…one must have the call detail records and mapping software."  On the other hand, Agent Shute testified that, in order to be an ***expert*** in historical cell site analysis, "one needs to have 1) knowledge of how a cell phone network operates; 2) experience going through volumes of call detail records; and 3) practical experience in geolocating a cell phone that is 'attached' to a human being."[25]

Here, Detective Zanotelli's testimony was based on the raw cell phone data which he input into mapping software to create the Zanotelli Maps.  As did Detective Young in *Saltzman,* Detective Zanotelli in this case simply testified from the cell phone records identifying what calls were made or received by Spottsville's and Green's cell phones, and the location of the towers shown in the cell phone records as having accepted the calls.

Agent Shute's ***expert*** analysis and testimony in *Saltzman* went much further than simply plugging information received from the cell phone records into mapping

---

[23] *Saltzman*, 128 So.3d at 1066.  The Third Circuit found the evidence--which included a great deal of evidence other than just the testimony of Detective Young and Agent Shute regarding the defendants' historical cell phone records--when viewed in the light most favorable to the prosecution (*Jackson v. Virginia*, 443 U.S. 307 (1979); *State v. Captville*, 448 So.2d 676 (La. 1984)), sufficient to convict Saltzman.  Since Spottsville's appeal relates to testimony and exhibits concerning historical cell phone data, only that evidence is discussed herein.
[24] 13-276 at p. 73, 128 So.3d at 1105.
[25] 13-276 at p. 69, 128 So.3d at 1103.

software, as Detective Young had done there and as Detective Zanotelli did here. Agent Shute inspected the cell phone towers to make sure that the orientation of the towers set forth in the tower list was accurate and used an engineering cell phone[26] to determine the signal strength of the cell phone and the cell site to which the cell phone connected. He used the information developed by Detective Young from the cell phone data, as to the locations of the victim and the defendants at particular times, to determine whether the readings he obtained from the cell sites were accurate.

The Third Circuit in *Saltzman* held only that the trial court did not err in qualifying Agent Shute as an expert and admitting his testimony into evidence. It did not render any opinion as to the admissibility of lay witness testimony regarding cell phone records provided to the witness by a cell phone provider. In short, we find that *Saltzman* does not support Spottsville's argument in this case.

Here, Detective Zanotelli did not testify as an expert witness. Thus, his testimony was not subject to Article 702(A), but is governed by La. C.E. art. 701, which provides that if a witness is not testifying as an expert, any opinion testimony of the witness must be "(1) rationally based on the perception of the witness; and (2) helpful to a clear understanding of his testimony or the determination of a fact issue."

The Louisiana Supreme Court has interpreted Article 701(A) to mean that "a lay witness is permitted to draw reasonable inferences from his or her personal observations." *State v. Casey,* 99-0023, p. 12 (La. 1/26/00); 775 So.2d 1022, 1033. This Court has held that a law officer may testify as to matters within his personal knowledge acquired through experience without being qualified as an expert. *State v. Griffin,* 14-251 (La. App. 5 Cir. 3/11/15), 169 So.3d 473, 487.

---

[26] Agent Shute explained that an "engineering cell phone" is "a phone that can be looked at in engineering mode[.]" *Saltzman*, 128 So.3d at 1103.

The trial court is vested with much discretion in determining whether to admit lay or expert testimony into evidence. *State v. Nelson,* 14-252 (La. App. 5 Cir. 3/11/15, 169 So.3d 493, 507, *writ denied,* 15-685 (La. 2/26/16), 187 So.3d 468. Two issues to be considered by a reviewing court in determining whether the trial court abused its discretion in allowing lay opinion testimony are: (1) was the testimony speculative opinion evidence or simply a recitation of or inferences from facts based upon the witness' observations; and (2) if the testimony was admitted in error, was the testimony so prejudicial to the defense as to require a reversal. *Id.*

The Third Circuit in *Saltzman* did not hold that testimony and evidence of the type presented by Detective Zanotelli here can only be introduced through a qualified expert witness in the field of historical cell phone site analysis or triangulation, as suggested by Spottsville. The same is true of the Second Circuit in *State v. Tabb,* 55,514 (La. App. 2 Cir. 4/10/24), 383 So.3d 1066. In *Tabb*, the State introduced evidence of cell phone geolocation of the defendant's cell phone through an expert witness. Although the defendant countered the State's evidence through its own expert in the field of geolocation of cellular devices,[27] he nevertheless argued on appeal that "cell phone geolocation was erroneously allowed to suggest his precise locations, when in fact there is no basis for finding pinpoint locations of a cell phone by historical data."[28] The Second Circuit rejected this argument, finding that "Louisiana courts have qualified and accepted the use of cell phone data for geographical analysis evidence for several years and appellate courts have recognized this evidence as sufficient to uphold convictions."[29] The Second Circuit

---

[27] *Tabb*, 383 So.3d at 1074.
[28] *Id*., at 1077.
[29] *Id*. at 1077-78, citing *State v. Davis,* 13-275 (La App. 3 Cir. 10/23/13), 129 So.3d 554, *writ denied,* 14-0010 (La. 6/13/14), 140 So.3d 1186, *cert. denied,* 574 U.S. 1014, 135 S.Ct. 678, 190 L.Ed.2d 393 (2014) (trial court did not abuse its discretion in admitting testimony from a special agent as an expert in the field of historical cell site analysis). See also, *State v. Caballero,* 22-0441 (La. App. 1 Cir. 11/4/22), 356 So.3d 389, *writ denied,* 22-01777 (La. 4/25/23), 359 So.3d 982 (sheriff's deputy testified as an expert in cell data analysis to determine the location of the defendant's and her boyfriend's phones, but the evidence was only a part of the evidence used to convict the defendant, which was sufficient to sustain her conviction).

did not opine that lay witnesses may not testify about the mapping of cell phone data received from cell phone providers.

On point are opinions rendered by the First and Fourth Circuits that have considered the very issue that is presently before us, holding that a police officer is allowed to testify as to cell site location data without having to be qualified as an expert. In *State v. Morgan,* 12-2060 (La. App. 1 Cir. 6/7/13), 119 So.3d 817, 827, a detective was allowed to testify regarding cell phone records that he had obtained from the cell provider, which listed calls made and received by the cell phone, the numbers used to identify the towers generally, and the addresses and GPS coordinates of the towers that the cell phone used when a call was made or received. The First Circuit held that a detective, as a lay witness, "can infer and tell the jury what cell tower accepted the mobile phone signals at specific times based on that witness's examination of cell phone records." *Id.*

In *State v. Phillips,* 23-243, p. 13 (La. App 1 Cir. 9/28/23), 376 So.3d 880, 888, the detective who testified as a lay witness had served a search warrant on the defendant's cell phone provider, had received and reviewed the records showing incoming and outgoing calls, the date and time of the calls and the location of the towers that accepted the calls. He then plotted the course taken by the defendant after the incident by plugging the data into mapping software. The defendant contended that the testimony given by the detective required specialized knowledge or skill, which the detective did not possess. The appeals court held that the trial court did not abuse its discretion in permitting a detective to testify regarding cell site location data where the detective's testimony was non-speculative and recited facts and inferences based on records provided by the defendant's cell phone provider.

The Fourth Circuit Court of Appeal reached a similar decision in *State v. Jackson,* 2015-0809 (La. App. 4 Cir. 5/25/16), 193 So.3d 425, *writ denied,* 2016-

1294 (La. 5/26/17), 221 So.3d 79 and *wit denied sub nom, State v. Washington,* 2016-1471 (La. 6/16/17), 219 So.3d 1112. There, appellant, Jackson, appealed the trial court's decision to admit the testimony of a detective, who was not qualified as an expert in cell phone tower locations and ranges, regarding data contained in his cell phone records. Citing *Saltzman, supra,* the appellant argued that "determining location by use of cell phone records is a subject for expert analysis."[30] The Court disagreed.

The detective in *Jackson* testified that the cell service providers supplied him with cell phone records, which included the calls made and received and the cell towers used to process the calls, and the geographical areas in which the towers were located, which he then used in conjunction with his investigation.[31] The Fourth Circuit found that the detective did not need to be qualified as an expert in order to present this evidence, stating:

> …Detective Hamilton was not required to determine the location of the cell towers [unlike Agent Shute in *Saltzman*]; rather, the cell service providers provided that information to him. Detective Hamilton explained which cell towers accepted the cell phone signals from Mr. Washington and Mr. Jackson's cell phones at specific times based on his examination of the cell phone records. Thus, we find that the district court did not abuse its discretion in allowing Detective Hamilton to testify as to the calls made and received and the tower locations for the telephone calls.[32]

Spottsville's and Green's cell phone records obtained and reviewed by Detective Zanotelli, and used by him to create the Zanotelli Maps, contained the same information underlying the testimony of the detectives in *Saltzman, Morgan, Phillips* and *Jackson*.[33] His testimony was of the same character and content as the testimony presented by the lay witnesses in those cases.

---

[30] *Jackson*, 193 So.3d at 438.
[31] *Id.*
[32] *Id.* at 438-39.
[33] See also *State v. Cole,* 15-358 (La. App. 5 Cir. 12/23/15), 1822 So.3d 1192, wherein Detective Solomon Burke testified as a lay witness regarding information contained in the victim's and one of the perpetrator's cell phone records. This testimony was, apparently, admitted without objection and its admission was not raised as an error on appeal, although the defendant raised insufficiency of the evidence to convict him as an error. The appeals court accepted that this evidence was part of the

In this case, Detective Zanotelli received the cell phone records from the cell provider, personally reviewed them, and personally created maps by inputting the latitude and longitude coordinates contained in those cell phone records into mapping software. Detective Zanotelli did not determine the location of the cell towers or inspect them. His testimony was in the nature of "a recitation of or inferences from facts" based upon his review of the cell phone records, not "speculative opinion evidence."[34]

Accordingly, we find the trial court did not abuse its discretion in admitting Detective Zanotell's testimony regarding the cell phone records or in admitting State's Exhibits 160D and 160E into evidence at trial. For those reasons, the trial court also did not err in denying Spottsville's Motion for New Trial to the extent that the motion was based upon Spottsvile's contention that the trial court erred in admitting the cell phone evidence at trial.

Moreover, even if the trial court had erred in admitting Detective Zanotelli's testimony, the error would not have been "so prejudicial to the defense as to require a reversal."[35] The State's case was not dependent on the cell phone evidence presented through Detective Zanotelli; nor were the cell phone records and/or Detective Zanotelli's testimony regarding them the sole basis for attacking Spottsville's credibility.

Initially, Spottsville claimed to the investigating detectives that he was in New Orleans East at the time of the shootings. The cell phone evidence presented through Detective Zanotelli at trial was developed in order to confirm or deny Spottsville's alibi. At trial, Spottsville testified and admitted that he had lied to the detectives about his whereabouts at the time of the shooting. He testified that he was *not* in

___

evidence used to convict the defendant, which, *in toto*, was legally sufficient to sustain defendant's conviction.

[34] *Nelson, supra*, 169 So.3d at 507.

[35] *Id.*

New Orleans East at the time of the shootings as he had initially represented, but was at Henry's apartment with Green and Walker, and that he and Green only went to New Orleans East when they fled from Henry's apartment *after* the shootings. He further testified that he shot Lamb, although he claimed to have done so in self-defense. Spottsville also testified that he had reviewed his cell phone records from the night of the shootings and answered questions regarding those records on cross-examination. Spottsville's testimony alone provided a sufficient basis for the jury to find him not credible.

Even if Spottsville had not testified at trial, the State introduced other evidence that called Spottsville's credibility into question. Henry and Lamb provided eyewitness testimony. Both placed Spottsville inside Henry's apartment at the time of the shootings, put a gun in his hand, and had him firing the gun at Ovide and Lamb. Moreover, Detectives Faucetta and Roniger also testified about the cell phone records without objection from defense counsel. This evidence, combined with the other evidence introduced by the State at trial, was sufficient to challenge Spottsville's credibility and to sustain his convictions, without Detective Zanotelli's testimony regarding the cell phone records.

Any error in admitting Detective Zanotelli's cell phone evidence was harmless. Accordingly, the decisions of the trial court and Spottsville's convictions are affirmed.

## ERRORS PATENT

We have reviewed the record for errors patent in accordance with La. C.Cr.P. art. 920(2); *State v. Oliveaux,* 312 So.2d 337 (La. 1975); and *State v. Weiland,* 556 So.2d 175 (La. App. 5 Cir. 1990); and have found the following errors that are discoverable by a mere inspection of the pleadings and proceedings, without inspection of the evidence:

### 1. Imposition of Sentence without Benefits as to Count 3.

The sentence on Count 3, attempted second degree murder (La. R.S. 14:30.1, 14:27), was imposed without restrictions on probation, parole or suspension of sentence, as required under R.S. 14:27(D)(1)(a). At the time this offense was committed, the penalty for second degree murder was "life imprisonment at hard labor without benefit of parole, probation or suspension of sentence."[36] The penalty for an attempt to commit any crime punishable by death or life imprisonment was imprisonment at hard labor for not less than ten years nor more than fifty years without benefit of parole, probation or suspension of sentence.[37]

Under La. R.S. 15:301.1 and *State v. Williams,* 00-1725 (La. 11/28/01), 800 So.2d 790, a statute's requirement that a defendant be sentenced without benefits is self-activating. Therefore, the trial court's failure to impose defendant's sentence without benefits requires no corrective action; however, the UCO and the Minute Entry of sentencing also do not reflect that Spottsville's sentence on Count 3 is to be served without benefit of parole, probation or suspension of sentence. Accordingly, we remand the matter for correction of the Minute Entry of sentencing and the UCO to reflect the proper restriction of benefits. See *State v. Jones,* 22-527 (La. App. 5 Cir. 5/24/23), 366 So.3d 821, 837; *State v. Breaux,* 22-535 (La. App. 5 Cir. 4/26/23), 362 So.3d 1020, 1026.

### 2. Failure to Impose a Fine as to Count 4.

Spottsville was convicted on Count 4 of being a felon in possession of a firearm. La. R.S. 14:95.1 provides for a mandatory fine of "not less than one thousand dollars nor more than five thousand dollars." Neither the sentencing transcript, the Minute

---

[36] La. R.S. 14:30.1.
[37] La. R.S. 14:27.

Entry of Sentencing, nor the UCO reflect that the mandatory fine was imposed as to Count 4.

This Court has the authority under La. C.Cr.P. art. 882 to correct an illegally lenient sentence at any time, even if the issue of an illegal sentence was not raised by the defendant or the State. *State v. Campbell,* 08-1226 (La. App. 5 Cir. 5/26/09), 15 So.3d 1076, 1081, *writ denied,* 09-1385 (La. 2/12/10), 27 So.3d 842. This authority is permissive rather than mandatory. *State v. Horton,* 09-250 (La. App. 5 Cir. 10/27/09), 28 So.3d 370, 376.

In the present case, the State did not raise this issue. Spottsville is represented in this appeal by the Louisiana Appellate Project, which provides appellate legal services for indigent criminal defendants in non-capital cases. This Court has declined to use its authority to remand cases for the imposition of mandatory fines where the defendant is indigent. See, *e.g., State v. Harrell,* 18-63 (La. App. 5 Cir. 10/17/18), 258 So.3d 1007, 1014. Due to Spottsville's indigent status, we decline to remand this matter for imposition of the mandatory fine.

**<u>CONVICTIONS AFFIRMED; SENTENCES AFFIRMED AS TO COUNTS 1, 2 AND 4; REMANDED FOR CORRECTION OF UCO AND MINUTE ENTRY OF SENTENCING AS TO COUNT 3</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**OCTOBER 30, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

## 24-KA-26

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN C. GREFER (DISTRICT JUDGE)
GWENDOLYN K. BROWN (APPELLANT)      MATTHEW R. CLAUSS (APPELLEE)      THOMAS J. BUTLER (APPELLEE)

**MAILED**
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053